**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 96-4431

ERIC CREIGHTON SAMPSON, a/k/a Big
E,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                               No. 96-4446

CEDRIC LAMONT DEAN, a/k/a Ced,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
William L. Osteen, Sr., District Judge, sitting by designation.
(CR-95-31)

Argued: January 30, 1998

Decided: April 2, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by published opin-
ion. Judge Motz wrote the opinion, in which Judge Murnaghan and
Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Noell Peter Tin, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina; Sharon Dunigan Jumper, Charlotte, North Carolina, for Appellants. Gretchen C.F. Shappert, Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Stephen Luke Largess, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellants. Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Eric Creighton Sampson and Cedric Lamont Dean of various narcotics and firearms offenses. The district court sentenced Sampson to life imprisonment and Dean to life imprisonment plus five years. Sampson and Dean appeal, asserting several trial and sentencing errors. We affirm the convictions and Sampson's sentence; however, we vacate Dean's sentence and remand for resentencing consistent with this opinion.

I.

The government produced evidence at trial that Sampson, Dean, and numerous other persons engaged in a three-year conspiracy to distribute cocaine and cocaine base (crack). The conspiracy took place from 1992 to 1995. The co-conspirators sold drugs in the home of Mack Hopper, which is located within one thousand feet of a playground, the Boulevard Homes and Southside Homes, both of which are public housing facilities, and at the Little Rock Apartments.

Two of the defendants' co-conspirators, Mack Hopper and Marcus Massey, testified at length as to the multiple illegal activities of Sampson and Dean. Hopper related that he frequently sold crack for Sampson and with Dean, and that Dean carried and brandished a gun

2

during robberies of other drug dealers. Massey corroborated this testimony and explained that he, Hopper, Dean, Sampson, and others engaged in a wide-ranging drug conspiracy in which six or more persons worked for Sampson and Dean.

In addition, both Hopper and Massey testified that, along with Dean and Sampson, they sold "flex" (counterfeit cocaine) to unsuspecting purchasers. Massey recounted a botched sting operation in which he and Dean attempted to sell to undercover officers $8,000 worth of flex, but instead were arrested. Several other drug dealers and users corroborated Hopper and Massey's damaging testimony.

On the basis of this evidence, the jury convicted Sampson and Dean of conspiring to distribute cocaine and cocaine base within one thousand feet of a playground or public housing facility in violation of 21 U.S.C.A. §§ 841(a)(1), 846 and 860 (West 1981 & Supp. 1997). In addition, the jury found Dean guilty of possession with intent to distribute cocaine base in violation of 21 U.S.C.A.§ 841(a)(1), of using or carrying a firearm in connection with a drug trafficking crime in violation of 18 U.S.C.A. § 924(c)(1) (West Supp. 1997), and of possession of a firearm by a convicted felon in violation of 18 U.S.C.A. §§ 922(g)(1) and 924(a)(2) (West Supp. 1997).

On appeal, Sampson and Dean contest their convictions and their sentences. We turn first to the challenges to their convictions.

II.

A.

One count of the indictment charged Sampson and Dean with conspiracy to violate 21 U.S.C.A. § 841(a)(1) which prohibits distribution of crack cocaine. Sampson and Dean maintain that the government constructively amended this count, effectively prosecuting them for conspiracy to distribute counterfeit cocaine in violation of 21 U.S.C.A. § 841(a)(2) (West Supp. 1997), in addition to conspiracy to distribute genuine cocaine in violation of 21 U.S.C.A. § 841(a)(1). Their contention is meritless.

3

First, contrary to Sampson's and Dean's arguments, the "crime" the government assertedly amended the indictment to charge them with is not forbidden by § 841(a)(2). A plain reading of § 841(a)(2) clearly demonstrates that flex is not a "counterfeit substance" within the meaning of that statute. A "counterfeit substance" under § 841(a)(2) is defined as:

> a controlled substance which, the container or the labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, number or device, or any likeness thereof, of a manufacturer, distributor, or dispenser other than the person or persons who in fact manufactured, distributed, or dispensed such substance and which thereby falsely purports or is represented to be the product of, or to have been distributed by, such other manufacturer, distributor, or dispenser.

21 U.S.C.A. § 802(7) (West 1981) (emphasis added).

A "controlled substance," in turn, is defined as "a drug or other substance . . . included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C.A. § 802(6) (West Supp. 1997). Those schedules do not list "flex." Nor is it reasonable to conclude that flex, which (trial testimony established) is made out of "candle wax, flour and baking soda," would be considered a controlled substance under the statute. Thus, § 841(a)(2) is patently inapplicable. That statute seems to have been designed to prosecute the unauthorized use of controlled substances found in commercial settings such as prescription drugs, not those sold in street deals. For example, "dispenser" is statutorily defined as a "practitioner who so delivers a controlled substance to an ultimate user or research subject," 21 U.S.C.A. § 802(10) (West 1981); and "practitioner" is defined as a "physician, dentist, veterinarian, scientific investigator, pharmacy, hospital or other person licensed, registered, or otherwise permitted . .. to distribute, dispense, [or] conduct research." 21 U.S.C.A.§ 802(21) (West Supp. 1997).

Selling flex does not constitute a crime punishable by any known federal law. Simply because a substance looks like cocaine, and the defendant misrepresents to his unsuspecting purchaser that the sub-

4

stance is cocaine, does not make the mere distribution of that substance a violation of the federal narcotics laws.

Sampson and Dean nonetheless maintain that "whether flex sales are an indictable offense or not," the government improperly broadened the basis on which to convict them beyond that contained in the indictment. Reply Brief at 3. This argument misunderstands what is necessary for a court to find that an indictment was constructively amended. We must find that "either the government (usually during its presentation of evidence and/or its argument),[or] the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). For a constructive amendment to have occurred, therefore, the government's presentation at trial, must expose defendant to criminal "charges that are not made in the indictment against him." Id. at 711 (quoting Stirone v. United States, 361 U.S. 212, 217 (1960)). In this case, Sampson and Dean could not be, and were not, convicted of a crime based on selling flex. The government did not urge the jury to convict Sampson and Dean because they sold flex; the district court did not instruct the jury that it could convict them of selling flex; and selling flex is not illegal under federal law.

True, the government did introduce evidence of flex sales, but merely as one of many "overt acts" undertaken by the co-conspirators that demonstrated the existence of the conspiracy. Defendants' only real challenge, therefore, is apparently one of relevancy. Sampson and Dean were charged with unlawfully conspiring to distribute illegal narcotics. To prove this charge, the government must demonstrate: "(1) an agreement between two or more persons (not including government agents), (2) to commit in concert an unlawful act," which in this case is to distribute illegal narcotics. United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991), overruled on other grounds by United States v. Burgos, 94 F.3d 849 (4th Cir. 1996). Proof of the first prong -- that the co-conspirators agreed to commit an unlawful act -- is often established through indirect evidence. See United States v. Morsely, 64 F.3d 907, 919 (4th Cir. 1995). Accordingly, the government can introduce a wide variety of lawful conduct to demonstrate that co-conspirators maintained the trust and comfort necessary to conspire to commit unlawful acts. Here, two witnesses, Hopper and

5

Massey, testified to first-hand knowledge that Sampson and Dean agreed to sell flex in lieu of cocaine to turn a quick profit so that they could purchase more illegal narcotics in furtherance of their drug operation. Thus, evidence of these flex sales, which was not itself criminal conduct, proves highly relevant to demonstrating that Sampson and Dean worked in concert to violate federal narcotics laws.

In sum, the government did not constructively amend the indictment by charging the defendants with selling flex, and the district court did not err in admitting evidence of the flex sales.

B.

Dean argues that his conviction under 18 U.S.C.A.§ 924(c)(1) for using or carrying a firearm in the commission of a narcotics felony should be reversed because the court's jury instructions failed to properly define the term "use" under § 924(c)(1) in conformity with the Supreme Court's dictates in United States v. Bailey, ___ U.S. ___, 116 S. Ct. 501 (1995).

Section 924(c)(1) makes it a crime for anyone to use or carry a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C.A. § 924(c)(1). Here, the district court, consistent with then-existing circuit precedent, instructed the jury that:

> a person is considered to have used a firearm if its presence in his possession -- regardless of whether that possession was actual, constructive, sole or joint -- facilitated in any manner with drug [sic] trafficking offense. In determining whether a firearm facilitated and had a relation to the drug trafficking offense, it is not necessary to find that the firearm was fired.

After trial in this case, the Supreme Court issued its Bailey decision, holding that, to satisfy the "use" prong of§ 924(c)(1), the government must demonstrate that the defendant actively employed the weapon by, for example, "brandishing, displaying, bartering, striking with [or] . . . firing or attempting to fire" the firearm. Bailey, 116 S. Ct. at 508. The instructions given, therefore, constituted error under Bailey.

6

Because Dean did not object at trial, however, our review is for plain error as defined in United States v. Olano , 507 U.S. 725, 731 (1993). See, e.g., United States v. Martinez, ___ F.3d ___, No. 95-5331, 1998 WL 63816 (4th Cir. Feb. 18, 1998). Dean must demonstrate that the instruction constituted (1) error, (2) which is plain, and (3) which "affects substantial rights," i.e. that it was prejudicial. Martinez, 1998 WL 63816, at *3. We retain discretion to correct the error only "if it seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (internal brackets and quotations omitted).

Clearly, the instruction here is erroneous and the error is plain. However, Dean cannot demonstrate that the error affected his substantial rights. This is so because the only evidence the government offered that Dean had violated § 924(c)(1) demonstrates that he carried or brandished firearms in furtherance of the drug conspiracy. The government presented no evidence of pre-Bailey passive "use" by Dean, e.g., a gun nearby during Dean's participation in a drug deal. Of course, the jury could have chosen to disbelieve the government's evidence and acquit Dean of violating § 924(c). But the jurors did not do this. Instead, they found Dean guilty of violating § 924(c). In doing so, they must necessarily have found that Dean brandished or carried the firearms, given that this evidence of "active" use was the only kind of "use" evidence before them. Accordingly, the erroneous jury instruction did not affect Dean's substantial rights.

C.

Dean, who had represented himself during the two days of trial with Sampson's attorney acting as his standby counsel, also contends that the district court erred in denying his motion for a continuance when he fell ill. Because Dean expressly agreed to have his standby counsel replace him not only during his illness but for the remainder of the trial, and because the district court ensured that Dean's right to competent counsel was not jeopardized by the replacement, this claim, too, lacks merit.

We review the district court's decision to deny a continuance for abuse of discretion. See Franken v. United States, 248 F.2d 789 (4th Cir. 1957). However, because a defendant maintains a Sixth Amend-

7

ment right to be represented by counsel of his choice, "a trial court must exercise its discretion" with great care when denying a continuance that defendant has requested for the purpose of obtaining or maintaining the counsel of his choice. United States v. Bragan, 499 F.2d 1376, 1379 (4th Cir. 1974). In such situations, the trial court must avoid "a myopic insistence upon expeditiousness in the face of a justifiable request for delay [that] can render the right to defend with counsel an empty formality." Id. (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). Here, the district court proceeded carefully and correctly.

On the morning after Dean fell ill, he requested that the court continue the trial. When the court denied this request, Dean asked that his standby counsel be allowed to take over cross-examination of witnesses and defense of the case. The court granted Dean's request only after it obtained assurances from standby counsel that she could assume Dean's defense on such short notice in light of her intimate knowledge of the case and her close collaboration with Dean during trial preparation. Nothing in the record suggests that Dean contemporaneously objected to the district court's decision or claimed that this replacement deprived him of his right to counsel. In fact, once Dean was feeling better, the district judge gave him the opportunity to resume his own defense, which he rejected, preferring that standby counsel continue in his stead.

Accordingly, because Dean consented to the assumption of his defense by standby counsel, and the district court took pains to ensure the adequacy of that representation, we must reject Dean's appellate contention that the court "force[d] the unsolicited participation of counsel" on Dean in denying his motion for continuance.

III.

Sampson and Dean contend that even if we affirm their convictions, we must nonetheless vacate their sentences and remand for resentencing because the district court erroneously calculated their sentences. They contend that the district court erred in three respects.

A.

Initially they assert that the court erred in calculating the amount of drugs attributable to each of them. The court attributed the crack

8

equivalent of over 1 1/2 kilograms of cocaine to Sampson and between 1/2 and 1 1/2 kilograms of cocaine to Dean.

Sampson and Dean challenge the testimony supporting these amounts as vague, uncorroborated, speculative, and thus not credible. "In reviewing sentences imposed under the [United States Sentencing] Guidelines, we must give `due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous.'" United States v. Uwaeme, 975 F.2d 1016, 1018 (4th Cir. 1992) (quoting 18 U.S.C. § 3742(e) (1988)). A defendant's base offense level under the Guidelines for drug conspiracy cases is determined by the amount of drugs "reasonably foreseeable to him within the scope of his unlawful agreement." United States v. Lamarr, 75 F.3d 964, 972 (4th Cir. 1996) (internal quotations omitted).

"Neither the Guidelines nor the courts have required precise calculations of drug quantity." Uwaeme, 975 F.2d at 1019. Rather, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the district court shall approximate the quantity to be used for sentencing." U.S.S.G. § 2D1.1, comment. (n. 12); see also Uwaeme, 975 F.2d at 1019. A district court may properly convert cash amounts linked credibly to the defendant's purchase or sale of narcotics so long as the court does not engage in double counting of both the proceeds and the narcotics themselves. Morsely, 64 F.3d at 915-16. Direct or hearsay testimony of lay witnesses as to the amounts attributable to the defendant can provide sufficiently reliable evidence of quantity. See United States v. Cook , 76 F.3d 596, 604 (4th Cir. 1996); Lamarr, 75 F.3d at 972; United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir. 1994); Uwaeme, 975 F.2d at 1019. Where witnesses' estimates of drug amounts are uncertain, however, a district court is well advised to sentence at the low end of the range to which the witness testified. See, e.g., Cook , 76 F.3d at 604; Lamarr, 75 F.3d at 972 (citing United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993)).

The majority of the evidence relied upon by the district court in this case consists of eyewitness testimony regarding precise amounts of cocaine attributable to the defendants. With respect to Dean, the district court attributed 24 ounces of crack cocaine based on firsthand

9

accounts of drug robberies in which Dean directly participated. Moreover, on the few occasions where the witnesses provided the court with a range of drug amounts, the district court attributed the lowest amount to Dean. Similarly, with respect to Sampson, the district court specifically credited the testimony of Charles Guy who testified that he observed Sampson dealing about $2,000 of crack per week for an entire year, which could total as much as 78 ounces of crack. The district court, however, only attributed one ounce of crack for 45 weeks, or 45 ounces, to Sampson.

In addition to these amounts, the district court attributed to Sampson and Dean nine ounces of crack cocaine, equaling the $8,000 proceeds that they obtained from the flex sale made to undercover agents. Sampson and Dean maintain that the court erred because the government presented insufficient evidence to determine whether the $8,000 procured from the flex sale would have been reinvested into their drug operation. The district court reasoned that while it could not count the amount of flex directly into the quantities of narcotics attributable to defendants, it could count the drug-equivalent of the proceeds from the flex sale based on evidence that defendants generally used such proceeds to buy "drugs, and other things."

Because flex is not a controlled substance, the district court properly recognized that the sale, standing alone, could not be attributed to defendants as if it were a drug sale. The court also correctly concluded that it could count the proceeds from the flex sale to the extent those proceeds were used to purchase illegal drugs . See United States v. Hicks, 948 F.2d 877, 882 n.4 (4th Cir. 1991) (affirming district court's conversion of cash seized from defendant's home to drug equivalent because "there was ample evidence on which the district court could have found that all the money was the proceeds of drug transactions") (emphasis added); United States v. Gonzalez-Sanchez, 953 F.2d 1184, 1186-87 (9th Cir. 1992) (holding district court clearly erred in attributing drug-equivalent of cash seized at defendant's home where no evidence "of a connection between the money seized and a drug transaction" was before the court). The difficulty here is that no evidence before the district court specifically linked the entire $8,000 of flex proceeds to the defendants' purchase or sale of narcotics. Rather, the only pertinent evidence demonstrates that defendants customarily invested a portion of flex sale proceeds to buy drugs,

10

with the remainder used for lawful purchases such as"clothes [and] cars." To be sure, this evidence demonstrates that some portion of the flex transaction is linked to defendants' drug transactions, and thus supports the district court's attribution of that portion to defendants. This evidence, however, does not adequately support attributing the entire $8,000 to Sampson and Dean. Accordingly, the district court erred in converting all $8,000 into its equivalent drug amount.

Although the evidence before the district court did not adequately support attributing all the proceeds of the flex sale to Dean and Sampson, this error is harmless.[1] Even if the nine ounces of crack related to the flex sale proceeds is subtracted from the total amount of narcotics attributable to defendants, they remain at the same base offense levels. The district court attributed 35 1/4 ounces of crack (roughly equal to one kilogram of cocaine) to Dean and assigned him a base offense level of 36 for dealing between 1/2 and 1 1/2 kilograms of cocaine. Even without the nine ounces of crack associated with the flex proceeds, Dean's total amount nonetheless falls between 1/2 and 1 1/2 kilograms, placing him at level 36. Similarly, based on the testimony of Charles Guy alone, Sampson is responsible for distributing 45 ounces of crack. This amount, combined with other testimony linking Sampson to numerous other deals, brings his total narcotics level to well above 1 1/2 kilograms, even without attribution of the nine ounces of crack associated with the flex proceeds, leaving his base offense level of 38 unchanged.

B.

Sampson and Dean next assert that the district court calculated their sentences contrary to the dictates of § 2D1.2(a)(1) of the Sentencing Guidelines. Specifically, they argue that§ 2D1.2(a)(1) only permits a court to consider an enhancement as to those controlled substances directly involved in a protected location, here within one thousand feet of a playground or public housing project. Accordingly, because the district court calculated the defendants' sentences under § 2D1.2(a)(1) based on the total amount of narcotics transacted dur-

_____

[1] Our holding as to U.S.S.G. § 2D1.2(a) infra does not affect the harmlessness of the district court's errror in light of the district court's obligation, under § 2D1.2(a), to "apply the greatest" sentence to defendants.

11

ing the conspiracy, and not only those transacted near a playground or in public housing, the sentencing calculations were in error.

Section 2D1.2, entitled "Drug Offenses Occurring Near Protected Locations or Involving Underage or Pregnant Individuals; Attempt or Conspiracy," provides:

> (a) Base Offense Level (Apply the greatest):
>
> (1) **2** plus the offense level from § 2D1.1 applicable to the quantity of controlled substances <u>directly involving a protected location</u> . . .; or
>
> (2) **1** plus the offense level from § 2D1.1 applicable to the <u>total quantity of controlled substances involved in the offense</u> . . .

U.S.S.G. § 2D1.2 (emphasis added). Thus, the Guidelines require a sentencing court to determine what portion of the total amount of controlled substances were directly involved in a "protected location."

Importantly, the Sentencing Commission's Application Note 1 further highlights the district court's task. It provides:

> Where only part of the relevant offense conduct directly involved a protected location . . . subsections (a)(1) and (a)(2) <u>may result in different offense levels</u>. For example, if the defendant, as part of the same course of conduct or common scheme or plan, sold 5 grams of heroin near a protected location and 10 grams of heroin elsewhere, the offense level from subsection (a)(1) would be level 16 (2 plus the offense level for the sale of 5 grams of heroin, the amount sold near the protected location); the offense level from subsection (a)(2) would be level 17 (1 plus the level for the sale of 15 grams of heroin, the total amount of heroin involved in the offense).

U.S.S.G. § 2D1.2, comment. (n.1) (emphasis added). <u>See also United States v. Walker</u>, 993 F.2d 196, 198 (9th Cir. 1993) ("[T]he distinction drawn by the Guidelines is between drugs actually sold or possessed near the location and those drugs that are part of the same course of conduct but are sold or possessed outside the protected area. . . . [T]he drugs [must be] present within 1,000 feet of the school.").

12

Although the district court applied the two level enhancement under § 2D1.2(a)(1), it failed to make any findings that all of the narcotics attributable to Sampson and Dean were distributed within a protected area. Had the evidence before the sentencing court sufficiently demonstrated that all of the narcotics in question were distributed from a protected area, the district court's failure to make such findings would be inconsequential. See, e.g., United States v. Washington, 48 F.3d 73, 81 (2d Cir. 1995) (upholding attribution of all narcotics of conspiracy under § 2D1.2(a)(1) because the defendant did not "dispute that he lived within 1,000 feet of a school at all relevant times, and the evidence shows that all the sales attributed to [defendant] occurred at his place of residence " (emphasis added)). However, the contrary is true here.

The testimony at trial, as well as defendants' presentencing reports, reveal that in addition to the sales from Hopper's home, which was located within one thousand feet of a playground, the defendants distributed significant amounts of narcotics in three locations -- Southside Homes, Boulevard Homes, and Little Rock Apartments. Yet the defendants and the government stipulated at trial that only Hopper's home and the Southside and Boulevard Homes were protected areas. Accordingly, because we do not know whether the Little Rock Apartments is a protected area within the meaning of § 2D1.2(a), or whether the quantities attributable to the defendants included amounts distributed at the Little Rock Apartments, we cannot determine whether the district court correctly applied the two-point enhancement.**2**

_____

**2** The government erroneously relies on the jury's special verdict to support the district court's two point enhancement under § 2D1.2(a)(1). The jury in its special verdict specifically found that "a purpose" of the conspiracy was to distribute cocaine or cocaine base "within 1,000 feet of a playground or housing facility owned by a public authority." Accordingly, the government argues that, based on the jury's special verdict, the district court did not clearly err in treating all of the narcotics involved in the conspiracy as sold within the protected areas. We are unpersuaded. First, simply because the conspiracy had a "purpose" to distribute narcotics in a protected area does not mean that all narcotics attributable to defendants necessarily were distributed in that area. Indeed, the government itself admitted at sentencing that the conspiracy "was a bifurcated conspiracy . . . to violate 21 U.S.C. 841 with regard to crack, and it was a conspiracy to do that within 1,000 feet of a school

13

We therefore vacate and remand Dean's sentence to give the district court the opportunity to address the status of the Little Rock Apartments. On remand, the district court must calculate Dean's sentence under § 2D1.2(a)(1) and § 2D2.2(a)(2) and impose the greater sentence. In determining the sentence under subsection (a)(1), the court must address whether the Little Rock Apartments are in fact a protected area, or if not, make proper findings regarding the amount of narcotics dealt in the clearly established protected areas -- Hopper's home and the Southside and Boulevard Homes. When the court has calculated Dean's sentence under both subsections, it must then sentence Dean, employing the higher of the offense levels calculated. U.S.S.G. § 2D1.2(a).

We need not remand Sampson's case for resentencing because the greatest possible benefit he could receive from a resentence (if, for example, he was resentenced under § 2D1.2(a)(2), instead of (a)(1)), would simply reduce his total offense level by one point. In that case, Sampson's offense level would be reduced to 44 from 45, rendering his life sentence unaffected under Chapter 5, Part A of the Sentencing Guidelines.

C.

Finally, Sampson and Dean argue that the district court erred in imposing a three-level enhancement for their managerial roles in the offense under § 3B1.1 of the Sentencing Guidelines. That section provides:

_____

or a playground." The indictment even alleges that defendants conspired not only to distribute drugs within a protected area, but also to conspired to distribute controlled substances generally in violation of 18 U.S.C. § 841(a)(1). Moreover, evidence at trial demonstrated that defendants sold drugs both in areas known to the jury as protected -- e.g., Southside and Boulevard Homes -- as well as areas which the government did not affirmatively prove at trial were protected, namely the Little Rock Apartments. Thus, we cannot infer, based on the jury's special verdict alone, that all narcotics attributable to defendants were in fact distributed only in protected areas.

14

> Based on the defendant's role in the offense, increase the offense level . . .
>
> (b) if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

U.S.S.G. § 3B1.1. The defendants claim that the government produced insufficient evidence to support enhancement of their sentences under § 3B1.1(b). They are mistaken. Numerous trial witnesses established evidence sufficient to justify the enhancement.

With regard to Sampson, Hopper testified that he sold for Sampson and that Tony Moore "cooked" Sampson's crack. Eddie Little confirmed that Moore cooked crack for Sampson. In addition, Massey testified that Mr. James, J.C. Jeeter, Georgia Jeeter, Joanne Davis, Shirley Ann and May Moore worked for Sampson, and that an individual named "Doll" as well as Joanne Davis allowed Sampson to use their homes for crack distribution. As to Dean, Massey, who was intimately involved in the conspiracy with Dean and Sampson, testified that seven persons -- Mr. James, J.C. Jeeter, Georgia Jeeter, Joanne Davis, May Moore and "two [individuals] in the `Windsong Trail'" [a drug spot] -- worked for Dean distributing his crack. Sabrina Massey also recounted, and Massey confirmed, that she cut an ounce of crack for Dean on one occasion under Dean's instructions. Another cohort, Mumtaz, testified that he worked for Dean selling crack and knew of other addicts that worked for Dean. Accordingly, the district court did not err in enhancing Sampson's and Dean's sentences to reflect their managerial roles. See United States v. Falesbork, 5 F.3d 715, 722 (4th Cir. 1993).

IV.

For the foregoing reasons, we affirm the defendants' convictions and Sampson's sentence; however, we vacate Dean's sentence and remand for resentencing in accordance with this opinion.

AFFIRMED IN PART AND VACATED
AND REMANDED IN PART