**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5644

ROY BYNUM KEENER,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5645

RICHARD ANTHONY OWENS,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5646

SONJA WELCH,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

SHEILA WELCH WHITE,

No. 94-5647

Defendant-Appellant,

and

JOHN DAVID WHITE,
Defendant.

_____

Appeals from the United States District Court
for the Western District of North Carolina, at Bryson City.
Charles H. Haden II, Chief District Judge, sitting by designation.
(CR-93-71)

Argued: March 5, 1999

Decided: May 26, 1999

Before TRAXLER and KING, Circuit Judges, and
LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stephen Paul Lindsay, LINDSAY & HENSLEY, Asheville, North Carolina; Albert Malone Neal, Jr., Canton, North Carolina; David Grant Belser, BELSER & PARKE, P.A., Asheville, North

Carolina, for Appellants. Deborah Ann Ausburn, Assistant United States Attorney, Asheville, North Carolina, for Appellee. **ON BRIEF:** Robert H. Hale, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant White. Mark T. Calloway, United States Attorney, Asheville, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Roy Bynum Keener ("Keener"), Richard Anthony Owens ("Owens"), Sonja Welch ("Welch") and Sheila Welch White ("White") appeal the sentences imposed upon them for conspiracy to manufacture methamphetamine. See 21 U.S.C.A.§§ 841(a)(1) (West 1981), 846 (West Supp. 1998).[1] Keener also appeals his conviction for using and carrying firearms during and in relation to a drug trafficking offense. See 18 U.S.C.A. § 924(c)(1) (West Supp. 1998). We affirm.

I.

This case involves two separate conspiracies to manufacture and distribute methamphetamine in North Carolina. The first conspiracy, charged in the indictment against all of the defendants, occurred between January 1, 1993 and May 19, 1993. In late December 1992 or early January 1993, Owens traveled from North Carolina to California, where he met Arthur Sherman ("Sherman"), a long-time drug dealer, who had been involved in the manufacture of methamphetamine since approximately 1989. Owens and Sherman discussed going into business together and, upon returning to North Carolina,

_____

[1] Defendant David White has withdrawn his appeal.

3

Owens shipped Sherman 50,000 ephedrine pills which Sherman converted to approximately three-quarters of a pound of pure methamphetamine. Owens then returned to California to pick up the methamphetamine.

Approximately three weeks after returning to North Carolina, Owens persuaded Sherman to move to North Carolina and work with him producing methamphetamine. Owens, accompanied by Keener, met Sherman at a hotel in Gainesville, Georgia and, several days later, Owens took Sherman to the home of David and Sheila White. While there, Sherman manufactured, using makeshift laboratory equipment, approximately seven to eight ounces of pure methamphetamine from ephedrine oil he had brought with him from California. Owens, Sherman, Welch, and the Whites then engaged in extensive discussions over several days to formulate a specific plan for manufacturing methamphetamine. The discussions included plans to obtain needed supplies and to set up a laboratory for Sherman to manufacture methamphetamine from ephedrine. Welch, who had a plan for purchasing the precursor ephedrine pills without suspicion, would order the ephedrine tablets and have them shipped to an anonymous address through the private parcel service that employed David White. David White would then intercept the shipments and provide them to Sherman, who would convert them to methamphetamine. Once converted by Sherman, Owens and Frank Mosley ("Mosley") would handle distribution of the methamphetamine.

Between January and May 1993, the conspiracy ordered 177,600 25 milligram dosage units of ephedrine through a fictitious company established in Welch's name. Welch also ordered precursor chemicals that Sherman needed to convert the ephedrine to methamphetamine. In early April 1993, Owens approached Angela Watson ("Watson") for assistance in obtaining more sophisticated laboratory equipment to manufacture the methamphetamine. When Watson agreed to help, she and Owens traveled to Atlanta, Georgia to locate the needed equipment. While there, they visited a laboratory supply company and investigated the type and cost of the equipment they would need. Although they lacked sufficient cash to purchase the requisite equipment while in Atlanta, they made arrangements before leaving to fax the final order to the supply company. Upon returning to Owens' home, Owens and Watson met with Keener and Sherman to finalize

4

the equipment list, which Watson then faxed to the supply company as prearranged. In addition, Watson sent to the supply company, via overnight delivery, money orders which Keener had provided to her to pay for the order.

When the laboratory equipment arrived, it was taken to a camper in Tallulah Falls, Georgia. Shortly afterwards, Watson went to the camper where she saw methamphetamine being produced. Keener was also present at the camper when Watson was there.

In early May 1993, Owens asked Watson to make a second trip to Atlanta to purchase more laboratory equipment. Watson testified that when she returned from Atlanta, Mosley and Owens kidnapped her and threatened her over money and drugs which they claimed were missing. She escaped, however, and contacted local police for assistance. She also told the police about the methamphetamine manufacturing operation.

The second conspiracy charged in the indictment began on or about May 19, 1993, shortly after the altercation between Watson, Mosley, and Owens, when Keener approached Sherman about working directly with him to produce methamphetamine. The conspiracy continued until Keener and Sherman were arrested on June 23, 1993. During this time period, Keener met David Holland ("Holland") through Jill Arnold ("Arnold"), a mutual acquaintance. Keener asked Holland about obtaining precursor chemicals for the production of methamphetamine and about selling the final product. There was evidence that Holland successfully obtained approximately 1,000 ephedrine pills for Keener and that Holland attempted, on one occasion, to convert a container of ephedrine oil to methamphetamine. In addition, there was evidence that Keener rented a hotel room where Sherman produced approximately two ounces of pure methamphetamine, which was subsequently cut to four ounces. Keener provided Holland with three ounces for him to sell on behalf of the conspiracy.

The following day, the police arrested Sherman, Keener, and Holland, and searched Keener's residence where Sherman was also living. The search revealed methamphetamine, various items used to manufacture methamphetamine, and two loaded firearms located within three to five feet of Keener.

5

II.

Defendants raise several allegations of error regarding their sentences. We review the district court's legal conclusions de novo and its factual determinations for clear error. See United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989)."If the court's findings may rationally be said to be supported by a preponderance of the evidence, they may not be disturbed on appeal." United States v. Crump, 120 F.3d 462, 468 (4th Cir. 1997).

A.

Owens and Welch contend that the district court erred in its calculation of the amount of methamphetamine attributable to them for purposes of sentencing. The district court attributed 177,600 tablets of ephedrine to Owens and Welch, and an additional 50,000 tablets of ephedrine to Owens that Owens had provided to Sherman in April 1993. During the trial and at sentencing, two separate expert chemists testified that the conversion ratio between ephedrine and methamphetamine is approximately 90%, assuming an experienced chemist and ideal laboratory conditions. In sentencing Owens and Welch, the district court applied this ratio to the ephedrine quantities to arrive at an expected methamphetamine return.

On appeal, Owens and Welch do not dispute the quantity of ephedrine tablets attributed to them. Rather, they contend that the district court erred in applying a 90% conversion rate to the ephedrine tablets because it was based upon ideal laboratory conditions and because there was no evidence that a laboratory set up during the conspiracy ever achieved a 90% conversion ratio. Owens and Welch further contend that, in the absence of any specific evidence concerning the capability of the laboratories, the district court should have applied a 24% conversion ratio, which represents the methamphetamine return that Sherman had testified he was able to obtain from ephedrine tablets using makeshift laboratory equipment in California. We disagree.

The amount and nature of drugs attributed to a defendant need only be proven by a preponderance of the evidence, and the district court's findings in this regard will only be disturbed if clearly erroneous. See United States v. Cook, 76 F.3d 596, 604 (4th Cir. 1996). In cases

6

"where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." Id. at 604 (internal quotation marks omitted); see U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1, comment. (n.12) (1993). The district court may consider "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." U.S.S.G. § 2D1.1, comment. (n.12). "The district court is afforded broad discretion as to what information to credit in making its calculations." Cook, 76 F.3d at 604 (internal quotation marks omitted).

We cannot say that the district court clearly erred in applying a 90% conversion ratio to the ephedrine tablets attributed to Owens and Welch. The evidence established that Owens persuaded Sherman, an experienced methamphetamine manufacturer, to move from California to North Carolina for the purpose of manufacturing methamphetamine and that Owens and the other members of the conspiracy intended to outfit Sherman with the sophisticated laboratory equipment necessary to ensure a maximum return from the ephedrine. Defendants offered no independent evidence of drug quantity, actual returns, or expected returns, and there is no evidence that the 90% conversion ratio testified to by the expert chemists was not achievable by Sherman once he had the proper laboratory equipment and supplies. Accordingly, we conclude that the district court did not err in relying upon the unrebutted testimony of two expert chemists that an experienced chemist could achieve a 90% methamphetamine return from ephedrine. See United States v. Wagner, 884 F.2d 1090, 1097-98 (8th Cir. 1989) (relying upon the testimony of a qualified expert to determine the manufacturing capability of a laboratory).[2]

_____

[2] Alternatively, defendants argue that the district court should have sentenced them under U.S.S.G. § 2D1.11, which applies to "Unlawfully Distributing, Importing, Exporting, or Possessing a Listed Chemical." This argument is without merit. Defendants were neither charged with nor convicted of possessing or distributing listed chemicals. See 21 U.S.C.A. § 841(d), (g) (West Supp. 1998). Furthermore, the Guidelines specifically direct that the main drug offense section,§ 2D1.1, is to be applied to offenses involving the unlawful manufacture of a controlled substance if the resulting offense level is greater than that determined under § 2D1.11. See U.S.S.G. § 2D1.11(c).

7

B.

Sheila White appeals the district court's imposition of the mandatory minimum ten-year sentence she received under 21 U.S.C.A. § 841(b)(1)(A) (West Supp. 1998) for the 198.45 grams of methamphetamine attributed to her, contending that she should have only been sentenced to the mandatory minimum five-year sentence called for by 21 U.S.C.A. § 841(b)(1)(B)(viii) (West Supp. 1998). We disagree.

A mandatory minimum sentence of ten years must be imposed for "100 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." 21 U.S.C.A. § 841(b)(1)(A)(viii). A mandatory minimum sentence of only five years, however, is to be imposed for "10 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." 21 U.S.C.A. § 841(b)(1)(B)(viii).

White's ten-year minimum sentence was based upon the seven ounces of methamphetamine that Sherman manufactured in her home, which equated to 198.45 grams. Sherman testified that the product was "pure . . . crystal methamphetamine," and there is no conflicting evidence as to its characterization as pure methamphetamine as opposed to a methamphetamine mixture. Therefore, the ten-year mandatory minimum sentence clearly applies.

On appeal, White does not dispute the quantity or the quality of the substance attributed to her, nor does she disagree that the statute mandates a ten-year sentence if the substance in question exceeds 100 grams of pure methamphetamine. Rather, White contends that she is entitled to benefit from a mistake in the presentence report, which went undetected at sentencing by the district court, the government, and White.

Specifically, under the Sentencing Guidelines, White's base offense level should have been 32, based upon her responsibility for at least 100 grams but less than 300 grams of methamphetamine

8

(actual).**3** <u>See</u> U.S.S.G.§ 2D1.1(c)(6). The presentence report, how-ever, incorrectly assigned a base offense level of 26, which would only have been correct had the substance been a methamphetamine mixture. <u>See</u> U.S.S.G. § 2D1.1(c)(9). The presentence report did, however, correctly identify and recommend the ten-year mandatory minimum sentence for methamphetamine (actual) as the appropriate sentence. <u>See</u> U.S.S.G. § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.").

The end result was the calculation of a sentencing range that was too low but never applied, and the imposition of a sentence which was mandated by the statute. Because the ten-year mandatory minimum sentence called for by the statute should have been and was applied, there was no error in the district court's sentencing of White.

C.

Defendant Keener appeals his sentence for the drug trafficking con-victions, asserting that the district court erred in its calculation of the amount of methamphetamine attributable to him. Keener asserts three errors, which we address in turn.

Keener first contends that the district court erred in attributing to him the seven ounces of methamphetamine produced at David and Sheila White's home, asserting that there was insufficient evidence that he was involved in the first conspiracy or in a plan to manufac-ture, produce, use or otherwise distribute this methamphetamine. We disagree. Immediately upon leaving California to move to North Car-olina, Sherman met Owens and Keener at a hotel in Gainesville, Georgia. Within weeks, Sherman manufactured the methamphetamine at the Whites' home and, shortly thereafter, Keener provided money orders for the conspiracy to purchase more sophisticated laboratory equipment for Sherman. We conclude that the evidence was sufficient

_____

**3** "Methamphetamine (actual) refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance," U.S.S.G. § 2D1.1(c) (internal quotation marks omitted), or pure methamphet-amine.

for the jury to find that Keener was involved in the first conspiracy at the time Sherman manufactured the seven ounces of methamphetamine at White's house, and for the district court to attribute this seven ounces to Keener for purposes of sentencing.

Keener next contends that the district court erred in holding him responsible for the 1,000 ephedrine tablets which Holland gave to him and for the four ounces of methamphetamine that Keener and Sherman produced in the hotel room during the second conspiracy. Specifically, Keener asserts that the 1,000 tablets were used to produce the four ounces and, therefore, that the ephedrine was "double counted" against him. Again, we disagree.

Although Keener challenged the attribution of these amounts to him for other reasons, he did not claim before the district court that the ephedrine had been double-counted. Furthermore, Keener has failed to point to any evidentiary support for his belated assertion that the four ounces of methamphetamine was a product of the 1,000 ephedrine tablets that Holland gave to Keener. Accordingly, the district court did not err in attributing both the 1,000 tablets and the four ounces to Keener for purposes of sentencing.[4]

Finally, Keener contends that the district court erred in attributing 150 grams of methamphetamine to him for the pint of ephedrine oil that Arnold gave to Holland. Although Holland testified he was unable to produce any methamphetamine from it, there is no dispute that the conspiracy intended to produce methamphetamine from the ephedrine oil. At sentencing, an expert chemist testified that an experienced chemist, with ideal laboratory conditions, could obtain approximately 300 grams of methamphetamine from a pint of ephedrine oil. Although the district court could have attributed the full 300 grams of methamphetamine to Keener based on the expert testimony, see Wagner, 884 F.2d at 1097-98, the court, after hearing this testimony and considering the circumstances under which Holland attempted to produce methamphetamine from the ephedrine oil, found that 150 grams of methamphetamine was a more reasonable expecta-

_____

[4] Keener also asserts that the district court should have applied a 24% conversion ratio to the 1,000 tablets. We reject this argument for the same reasons previously discussed.

10

tion, see U.S.S.G. § 2D1.1, comment. (n.12) (court must "exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing"). We find that the district court did not clearly err in this calculation.

III.

Keener appeals his conviction under 18 U.S.C.A.§ 924(c)(1) for using or carrying a firearm during or in relation to a drug trafficking crime. In considering this ground for reversal,"we must determine whether there is substantial evidence, viewed in the light most favorable to the [g]overnment, to support the verdict." United States v. Hastings, 134 F.3d 235, 238 (4th Cir.), cert. denied, 118 S.Ct. 1852 (1998).

Following Watson's report to the police concerning the activities of the first conspiracy, Keener approached Sherman and established his own methamphetamine enterprise, enlisting the support of Holland, Arnold, and others. On June 23, 1993, police officers conducted a search of Keener's residence, where Sherman was also living. On the previous day, Sherman had produced methamphetamine from ephedrine tablets, a portion of which was given to Holland to sell.

When officers entered Keener's home the following day, Sherman was located in his bedroom area and Keener was seated at a table in the kitchen/dining area of the house. On the living room floor, at the entrance to the kitchen/dining area and within three to five feet of Keener, the officers located a brown leather satchel containing methamphetamine and a loaded .38 caliber Colt handgun. In addition, officers located a loaded .22 caliber Derringer pistol on a china cabinet in the kitchen/dining area, also within three to five feet from Keener. A 20-gauge shotgun, for which Keener was not charged, was located underneath the cabinet. During the search, officers also found various items used in the manufacture of methamphetamine, including sodium thiosulfate, niacin, pH papers, scales, and iodine crystals, as well as additional methamphetamine bags.

In count IV of the indictment, Keener was charged with using and carrying two different firearms, the .22 caliber Derringer handgun and

11

the .38 caliber Colt handgun. The district court charged the jury on both the "use" and "carry" prongs of§ 924(c)(1) and the jury returned a verdict convicting Keener of the offense as charged. Because the handguns were grouped within one count of the indictment, however, he received a single sixty-month sentence for both guns.

On appeal, Keener asserts that the government proceeded against him under the "use" prong of § 924(c)(1) and that, in light of the Supreme Court's subsequent clarification of that term in Bailey v. United States, 516 U.S. 137 (1995), there was insufficient evidence to support a conviction for "use" of a firearm within the meaning of § 924(c)(1).

In Bailey, the Supreme Court defined "use" under § 924(c)(1) as "active-employment," such as "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 148. The government concedes that there is insufficient evidence to support a conclusion that Keener actively employed a firearm during and in relation to a drug trafficking offense, and, therefore, that he "used" it within the meaning of§ 924(c)(1). However, the government contends that affirmance of the conviction is nevertheless appropriate because the evidence is sufficient to warrant a conviction on the basis that Keener "carried" a firearm. We agree.

Although Bailey requires more than mere storage or possession of a firearm to meet the definition of "use," the Court "made clear that an individual may violate § 924(c)(1) by `carrying' a firearm in situations when the defendant's conduct would not amount to the type of active employment necessary to constitute a `use.'" United States v. Mitchell, 104 F.3d 649, 653 (4th Cir. 1997). We have defined "carry" under § 924(c)(1) as "knowing possession and bearing, movement, conveyance, or transportation of the firearm in some manner." Id.; see generally Muscarello v. United States, 524 U.S. 125 (1998) (holding that "carry" under § 924(c) is not limited to carrying firearms on the person). Possession of the firearm "may be actual (the firearm is within the offender's immediate control) or constructive (the defendant exercises dominion or control over the weapon or the place where the weapon is located)." Mitchell, 104 F.3d at 653. "A firearm is carried in relation to a drug trafficking offense if it has some purpose or effect with respect to the drug trafficking crime and if its pres-

12

ence was not the result of accident or coincidence." Id. at 654
(internal quotation marks omitted).

When the officers entered Keener's residence, they found a loaded
Colt handgun, along with methamphetamine, in a satchel which was
obviously designed to be carried and which had been placed on the
floor between Keener and the entrance to his home. According to
Sherman's testimony, the satchel belonged to him, not Keener. How-
ever, Sherman denied any knowledge that the Colt handgun had been
placed in it. Accordingly, we conclude that the circumstantial evi-
dence was more than sufficient to support a verdict that Keener "car-
ried" a firearm during and in relation to his drug trafficking crimes.
See Hastings, 134 F.3d at 238; Griffin v. United States, 502 U.S. 46,
56-60 (1991) (affirmance is appropriate if a case is submitted to a jury
on two theories, the jury returns a general verdict of guilty, and the
evidence is sufficient to support a conviction on either theory).[5]

IV.

For the foregoing reasons, we affirm the convictions and sentences
of Keener, Owens, Welch, and White.

AFFIRMED

_____

[5] The government concedes that, because this case went to trial before
the decision in Bailey, the district court used an erroneous pre-Bailey def-
inition for "use." Keener did not, however, contend that the erroneous
instruction constituted plain error entitling him to relief from the convic-
tion. See Hastings, 134 F.3d at 239-44; see also United States v.
Sampson, 140 F.3d 585, 590 (4th Cir. 1998). In any event, we have
reviewed the jury instruction and conclude that, assuming that it was
error and that the error was plain, Keener has not demonstrated that the
error "affected his substantial rights" or that it "seriously affect[ed] the
fairness, integrity or public reputation of judicial proceedings." Hastings,
134 F.3d at 239 (internal quotation marks omitted).