**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 1, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DONALD RAY THOMAS, a/k/a Donald
Ray Thomas, II,

      Defendant - Appellant.

No. 17-1405

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00325-PAB-1)**
_____

Jacob R. Rasch-Chabot, Assistant Federal Public Defender (Virginia L. Grady, Federal
Public Defender, with him on the briefs), Denver, Colorado for Defendant-Appellant.

J. Bishop Grewell, Assistant United States Attorney (Robert C. Troyer, United States
Attorney, with him on the brief), Denver, Colorado for Plaintiff-Appellee.
_____

Before **HARTZ**, **MATHESON**, and **EID**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

      The sole issue presented on this appeal is the meaning of *counterfeit substance* in

§ 4B1.2(b) of the United States Sentencing Guidelines.  Defendant contends that a

counterfeit substance is a controlled substance that has been mislabeled or misbranded

fraudulently or without authorization—a definition that appears in a federal statute, 21 U.S.C. § 802(7). The government counters that it is a noncontrolled substance that is passed off as a controlled substance. Joining the five other circuits that have opined on the subject, we agree with the government.

Under USSG § 2K2.1(a)(2) the base offense level for a defendant convicted of a firearm offense is 24 if the offense was committed "subsequent to sustaining at least two felony convictions of either a crime of violence or controlled substance offense." The offense level is 20 if the defendant had a conviction of only one such offense. *See id.* § 2K2.1(a)(4). These provisions adopt the meaning of *controlled substance offense* in USSG § 4B1.2(b). *See* USSG § 2K2.1(a), App. n.1. That definition is as follows:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (*or a counterfeit substance*) or the possession of a controlled substance (*or a counterfeit substance*) with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b) (emphasis added). The guidelines do not define *counterfeit substance* for the purposes of this provision.

Defendant Donald Ray Thomas pleaded guilty in the United States District Court for the District of Colorado to possession of a firearm by a convicted felon. *See* 18 U.S.C. § 922(g)(1). On appeal he does not challenge the validity of his plea; but as permitted by his plea agreement with the government, he raises one challenge with respect to his sentence. Because it is undisputed that he had a prior felony conviction for a crime of violence (robbery), his base offense level was at least 20. Whether it was 20

2

or 24 depended on the characterization of his 2014 Colorado conviction of distribution of an "imitation controlled substance" under Colo. Rev. Stat. § 18-18-422(1)(a). Colorado defines an *imitation controlled substance* as:

> a substance that is not the controlled substance that it is purported to be but which, by appearance, including color, shape, size, and markings, by representations made, and by consideration of all relevant factors as set forth in section 18-18-421, would lead a reasonable person to believe that the substance is the controlled substance that it is purported to be.

Colo. Rev. Stat. § 18-18-420(3). Defendant challenges the district court's ruling that his conviction involved a "counterfeit substance" and therefore was a "controlled substance offense" under USSG § 2K2.1(a). Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we reject this challenge and affirm Defendant's sentence.

## I.      DISCUSSION

"Ultimately, our task in interpreting the Guidelines is to determine the intent of the Sentencing Commission." *United States v. Rivera-Oros*, 590 F.3d 1123, 1129 (10th Cir. 2009). We perform this task by applying traditional techniques of statutory construction. *See United States v. Archuleta*, 865 F.3d 1280, 1287 (10th Cir. 2017) (when a term "is not defined in the Guidelines, we must rely on the accepted rules of statutory construction in defining the term").

As a general rule, we interpret a word or phrase in a statute or the guidelines in accordance with its ordinary, everyday meaning. *See United States v. Marrufo*, 661 F.3d 1204, 1207 (10th Cir. 2011) ("When a term is not defined in the Guidelines, we give it its plain meaning."); Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of

Legal Texts, § 6 ("Ordinary-Meaning Canon") (2012) ("Reading Law"). The definition of *counterfeit* in the most authoritative legal dictionary is: "Made to look genuine in an effort to deceive; produced by fakery, esp. with an intent to defraud." Black's Law Dictionary 427 (10th ed. 2014). This is in keeping with the definitions in leading dictionaries for general use. *See* New Oxford American Dictionary 387 (2d ed. 2005) ("[M]ade in exact imitation of something valuable or important with the intention to deceive or defraud."); Webster's Third New International Dictionary 519 (2002) ("[M]ade in fraudulent imitation: produced with intent to deceive."). Thus, a substance that is not in fact a controlled substance but is passed off as such is commonly referred to as a counterfeit controlled substance. *See, e.g.*, *Franklin v. Bradshaw*, 545 F.3d 409, 412 (6th Cir. 2008) ("Hennig realized that they had been given counterfeit cocaine commonly referred to as 'fleece.'"); *United States v. Martinez*, 520 F.3d 749, 751 (7th Cir. 2008) ("The [drug] agents replaced the cocaine with 100 kilograms of counterfeit cocaine."); *United States v. Sampson*, 140 F.3d 585, 588 (4th Cir. 1998) (two co-conspirators "testified that . . . they sold 'flex' (counterfeit cocaine) to unsuspecting purchasers."). The government urges us to use the plain-English definition of *counterfeit* and construe *counterfeit substance* as a substance made in imitation of a controlled substance with intent to deceive.

Defendant does not contend that if we apply the common meaning of *counterfeit substance*, he could nevertheless prevail. He argues, however, that we should adopt a narrower meaning. He asserts that when determining the meaning of an undefined offense used in the guidelines, courts have not given the term its ordinary English

4

meaning but have instead looked to federal statutes, state laws, model codes, treatises, and dictionaries to determine the "generic, contemporary meaning" of the offense. Aplt. Br. at 11; *see United States v. Martinez-Cruz*, 836 F.3d 1305, 1309 (10th Cir. 2016) ("To determine the generic, contemporary meaning of a crime enumerated in the Guidelines, the court begins by looking to the federal statute under which the defendant was previously convicted" and "also examines . . . the definitions of the crime in a majority of the States' criminal codes, as well as prominent secondary sources, such as criminal law treatises and the Model Penal Code." (brackets and internal quotation marks omitted)); *Rivera-Oros*, 590 F.3d at 1126-27 ("We look to a wide range of sources to determine the generic meaning of an enumerated offense, including federal and state statutes, the Model Penal Code, dictionaries, and treatises."). Accordingly, in his view, we must adopt the definition of *counterfeit substance* commonly used in those sources.

We agree with Defendant that the statutory definitions of the term *counterfeit substance* most often refer to controlled substances that are fraudulently or falsely labeled. For example, and most notably, the federal Controlled Substances Act states the following:

> The term 'counterfeit substance' means a controlled substance which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, number, or device, or any likeness thereof, of a manufacturer, distributor, or dispenser other than the person or persons who in fact manufactured, distributed, or dispensed such substance and which thereby falsely purports or is represented to be the product of, or to have been distributed by, such other manufacturer, distributor, or dispenser.

5

21 U.S.C. § 802(7).  The term appears in 21 U.S.C. § 841(a), which provides:

(a) Unlawful acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
(1)  to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
(2)  to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

Paragraph (1) in general prohibits dealing in controlled substances.  The "Except as authorized" language at the beginning of subsection (a) is necessary, however, because some controlled substances serve useful purposes and can lawfully be manufactured, distributed, dispensed, or possessed, although they must still be regulated to protect consumers and prevent misuse.  Effective regulation of such substances requires that they be properly labeled—that is, that they not be what are called "counterfeit substances" in the statute.  Paragraph 2 prohibits trading in such counterfeits.  For example, even when a person is authorized to *manufacture* a controlled substance, that person is prohibited from *creating* a counterfeit substance by mislabeling the controlled substance.  *Cf. United States v. Khoury*, 901 F.2d 948, 965 (11th Cir. 1990) ("At a minimum, to prove a conspiracy to violate section 841(a)(2) . . . the government must provide some evidence that the conspirators planned to place on the substance or its container a trademark, trade name, or other identifying mark of a manufacturer other than the persons actually manufacturing the substance.")

The Uniform Controlled Substances Act uses the term *counterfeit substances* in the same way:

6

Counterfeit Substances Prohibited; Penalty.

   (a)  A person may not knowingly or intentionally manufacture
        or deliver, or possess with intent to manufacture or deliver,
        a controlled substance that, or the container or labeling of
        which, without authorization, bears the trademark, trade
        name, or other identifying mark, imprint, number, or
        device, or a likeness thereof, of a manufacturer, distributor,
        or dispenser, other than the person who manufactured,
        distributed, or dispensed the substance.

Unif. Controlled Substances Act § 404 (1995).  And the government does not dispute

Defendant's assertion that the laws of 36 states and the District of Columbia similarly

define *counterfeit substance*, although it points to eight states that have adopted the

meaning of *counterfeit substance* that it urges in this court.

        The essence of Defendant's position is that when dealing with a technical or

specialized subject, we should understand terms in their technical or specialized meaning.

As a general rule, we would agree with that proposition.  But that proposition cannot

override common sense.  In *Johnson v. United States*, 599 U.S. 133, 138 (2010), the

Supreme Court had to resolve the meaning in the Armed Career Criminal Act (ACCA),

18 U.S.C. § 924(e), of the noun *force*, which "has a number of meanings." The specific

question was whether the Florida offense of battery constituted a "violent felony" under

the Act (and so could be used to enhance the defendant's sentence).  That depended on

whether the requirement of "force" in the ACCA could be satisfied by "even the slightest

offensive touching," which was all the force necessary to establish the common-law

crime of battery (and battery under Florida law).  *See id.* at 139.  The Court refused to

adopt the common-law meaning of the term *force*, finding it incongruous as part of the

7

definition of the term *violent felony*, particularly because common-law battery was a misdemeanor rather than a felony. *See id.* at 139–42. It explained: "[W]e do not assume that a statutory word is used as a term of art where that meaning does not fit. Ultimately, context determines meaning, and we do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." *Id.* at 139–41 (citation and internal quotation marks omitted).

Similar reasoning requires rejection of Defendant's argument. Application of his definition of *counterfeit substance* in USSG § 4B1.2(b) adds no substantive content to the guidelines definition of *controlled substance offense*. For convenience we repeat that provision:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (*or a counterfeit substance*) or the possession of a controlled substance (*or a counterfeit substance*) with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b) (emphasis added). Under the statutory definition that Defendant would adopt ("The term 'counterfeit substance' means a controlled substance which [is mislabeled]." 21 U.S.C. § 802(7)), every counterfeit substance is already a controlled substance; a counterfeit substance is simply a controlled substance that is mislabeled to conceal its origin. The parenthetical "(or a counterfeit substance)" therefore would not include any item beyond those clearly encompassed by the term *controlled substance*, which immediately precedes the parenthetical. Statutes that regulate, say, the distribution of counterfeit substances (using Defendant's definition) are simply a subset of statutes

that regulate the distribution of controlled substances. We follow our precedent stating that "we should interpret statutory provisions and the guidelines in a way which gives meaning and effect to each part of the statutory or guideline scheme." *United States v. Acosta-Olivas*, 71 F.3d 375, 379 (10th Cir. 1995); *see* Reading Law, § 26, Surplusage Canon, at 174 ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

To avoid the surplusage canon, Defendant notes that the term *counterfeit substance* appears in § 4B1.2(b) only within a parenthetical and contends that "any redundancy . . . is therefore of little consequence." Aplt. Br. at 17. He relies on *Chickasaw Nation v. United States*, 534 U.S. 84, 88 (2001), in which Indian tribes claimed that a parenthetical statutory cross-reference in the Indian Gaming Regulatory Act exempted gambling operations from excise and occupational taxes. The Supreme Court quoted the following from a circuit-court opinion: "A parenthetical is, after all, a parenthetical, and cannot be used to overcome the operative terms of the statute." *Id.* at 95 (internal quotation marks omitted). (The quotation, appropriately enough, was in a parenthetical to the citation to the circuit-court opinion. We decline, in *this* parenthetical, to engage in a philosophical discussion about whether a parenthetical can be authority for the proposition that parentheticals are not authoritative.) But the *Chickasaw Nation* Court did not say that parentheticals are necessarily surplusage. On the contrary, it took the parenthetical cross-reference in the statute very seriously. Indeed, it was the central

9

subject of the Court's decision. The Court determined that it was required to treat the relevant language as surplusage not because it was contained in a parenthetical, but because "the language outside the parenthetical is unambiguous" and the Court could not "give the [parenthetical] reference independent operative effect without seriously rewriting the language of the rest of the statute." *Id.* at 89; *see id*. ("We agree with the Tribes that rejecting their argument reduces the [statutory reference in the parenthetical] to surplusage. Nonetheless, we can find no other reasonable reading of the statute.") We therefore conclude from *Chickasaw Nation* that we should try to give substantive effect to language in a parenthetical. And here, in contrast to *Chickasaw Nation*, giving the parenthetical in the guideline its common meaning adds eminently reasonable content to the guideline (by expanding the relevant offenses to encompass those involving fake controlled substances). We also observe that putting "or a counterfeit substance" in a parenthetical, rather than simply setting it off with commas, is more likely to have been for purposes of readability than to signify unimportance (as suggested by the dissent). There were already 10 commas in the sentence defining *controlled substance offense*. The reader may wish to try replacing the parentheses by commas and see how easy it would be to read the definitional sentence.[1]

---

[1] Replacing the parentheses by commas in the guideline would result in the following awkward language, in which the conjunction *or* sometimes joins substances and sometimes joins actions, thereby discombobulating the reader:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of

The dissent suggests that the "(or counterfeit substance)" parenthetical serves the purpose of clarification—making clear that counterfeit substances (as defined by the dissent) are among the controlled substances covered by the guideline. But if that were the intent, the Sentencing Commission would have used the word *including* rather than the word *or*. The Sentencing Commission appears to have followed a consistent practice that distinguishes (in accord with common usage) between parentheticals beginning with the word *including* and parentheticals beginning with the word *or* when the parenthetical appears after a term in a guideline. Parentheticals using the word *including* are meant to clarify the guideline; those with the word *or* are meant to expand the meaning. When it uses the word *including*, it is emphasizing that the term as used in the guideline is not excluding a particular subset of what is encompassed by the usual meaning of the term. For example, USSG § 2B3.2 cmt. n.1 speaks of "transportation systems and services (including highways, mass transit, airlines, and airports"). The words in the parenthetical are generally considered examples (subsets) of the terms before the parenthetical. We include in a footnote the occasions of this use of *including* in the guidelines.[2] In

a controlled substance, *or a counterfeit substance*, or the possession of a controlled substance, *or a counterfeit substance,* with intent to manufacture, import, export, distribute, or dispense.

[2] § 1B1.1 cmt. n.1(C), § 1B1.1 cmt. n.1(H), § 1B1.1 cmt. n.1(J), § 1B1.3 cmt. n.3(B), § 1B1.3 cmt. n.3(D), § 2A1.4 cmt. n.1, § 2A2.2(b)(2), § 2A2.3(a)(1), § 2A2.4(b)(1), § 2B1.1(b)(16), § 2B1.1 cmt. n.1, § 2B1.1 cmt. n.3(F)(i), § 2B1.1 cmt. n.15(A), § 2B2.1(b)(4), § 2B2.1 cmt. n.3, § 2B2.3(b)(2), § 2B2.3 cmt. n.1, § 2B3.2 cmt. n.1, § 2B5.1(b)(4), § 2B5.1 cmt. background, § 2B5.3(b)(6), § 2D1.1(b)(1), § 2D1.1(c) n.J, § 2D1.1 cmt. n.18(A), § 2D1.11(b)(1), 2D1.11 cmt. n.4, § 2D1.11 cmt. background,

contrast, when the Commission inserts a parenthetical beginning with the word *or* after a term in the guidelines, it is expanding the scope of the guideline to include things that would generally not be considered subsets of the term in its common meaning. For example, USSG § 2B1.1 comment n.10(C) speaks of "the defendant (or a person for whose conduct the defendant is accountable)" and comment n.10(D) speaks of "name (or other identifying information)." We include in a footnote other examples of this use of the word *or* in guidelines parentheticals.[3] Given this common usage and the practice of the Sentencing Commission, we can infer that if the Sentencing Commission intended the "or a counterfeit substance" parenthetical in § 4B1.2(b) to refer to those controlled substances defined as counterfeit substances in 21 U.S.C. § 802(7)—which are a subset of controlled substances—it would have said "including a counterfeit substance." That would have made clear that when § 4B1.2(b) spoke of controlled substances, it was including those controlled substances defined as counterfeit substances. But instead the Commission said "*or* a counterfeit substance," and the use of the word *or* was signaling

---

§ 2D1.12 cmt. n.3, § 2E2.1(b)(1), § 2G2.5(b)(2), § 2H3.1 cmt. n.1, § 2H3.1 cmt. n.4, § 2L1.1(b)(5), § 2R1.1 cmt. n.2, § 2R1.1 cmt. background, § 3A1.3 cmt. n.4(B), § 5F1.7 cmt. background (b)(2), § 5G1.3(a), § 5H1.1, § 8A1.2 cmt. n.3(G).

[3] § 1B1.5 cmt. n.3, § 2B1.1 cmt. n.10(C), § 2B1.1 cmt. n.10(D), § 2D1.6 cmt. n.1, § 2H4.1 cmt. n.2, § 2K2.4 cmt. n.1, § 2L1.1(b)(1), § 2L1.1(b)(3), § 2L1.2 cmt. n.7, § 2L2.1(b)(1), § 2L2.1(b)(4), § 2L2.2(b)(2), § 2Q1.2 cmt. n.3, § 2S1.1(a)(1), § 2S1.1 cmt. n.3(A), § 2S1.3 cmt. n.2, § 2X1.1 cmt. n.4, § 3A1.2(c)(2), § 3A1.3 cmt. n.4(A), § 3A1.3 cmt. n.4(B), § 3D1.2 cmt. background, § 3E1.1 cmt. background, § 4A1.2 cmt. n.2, § 5C1.2(a)(2), § 5E1.2 cmt. n.3, § 6B1.2 cmt. background, § 6B1.3, § 8C2.5(c)(1), § 8C2.5(c)(2), § 8C2.5(d)(1).

12

that the Commission was including substances that are not controlled substances. This is substantial support for our reading of the guideline.

It should also be noted that the definition of *controlled substance offense* in § 4B1.2(b) does not include the word *creation* along with the prohibited acts "manufacture, import, export, distribution, or dispensing," even though *creation* is the prohibited act unique to counterfeit substances, *see* 21 U.S.C. § 841(a)(2); *Khoury*, 901 F.2d at 965. This is a peculiar, and confusing, omission if the Sentencing Commission's focus in including the "or a counterfeit substance" parenthetical had been to make sure that the enhancement of the firearm-offense base offense level under § 2K2.1(a)(2) for prior drug convictions would encompass prior convictions under § 841(a)(2) (the federal counterfeit-substance provision) and similar state laws.

A further indication, if any is needed, that § 4B1.2(b) was not referencing the statutory definition of *counterfeit substance* is that the Sentencing Commission did not include a statutory reference in the guideline. Not only are such cross-references common in the guidelines, *see, e.g., United States v. Mills*, 485 F.3d 219, 223 (4th Cir. 2007) (citing numerous statutory cross-references in §§ 4B1.2 and 2K2.1), but of particular note, the Commission has even cross-referenced the statutory definition of *counterfeit substance* in a different guideline. Application note 4 to USSG § 2D1.1 (the guideline section used to compute the offense level for drug offenses) states: "The statute and guideline also apply to 'counterfeit' substances, which are defined in 21 U.S.C. § 802 to mean controlled substances that are falsely labeled so as to appear to have been legitimately manufactured or distributed." If the Sentencing Commission also intended

13

to use that statutory definition in § 4B1.2, it would be remarkable to omit the cross-reference there. *Cf. United States v. Lucero*, 747 F.3d 1242, 1249 (10th Cir. 2014) ("It is a well-settled principle of statutory construction that when Congress (or, as here, the Sentencing Commission) includes particular language in one section of a statute or Guideline, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). The cross reference to the statutory definition appeared in the original version of § 2D1.1 in 1987. *See* USSG § 2D1.1 cmt. n.2, at 2.40 (1987). The term *counterfeit substance* first appeared in § 4B1.2 as a result of Amendment 268 two years later in 1989. *See* U.S. Sentencing Guidelines Manual app. C, vol. I, Amend. 268 at 131–33 (2003). It is not as if it had never occurred to the Sentencing Commission to add the statutory definition as a cross reference. The omission of the cross-reference in § 4B1.2 only two years after it was added in § 2D1.1 appears to have been informed and intentional.

Defendant also argues that the history of § 4B1.2 supports his position. He contends that the language of the guideline before it was revised in 1989 clearly conveys the meaning he now advocates.[4] We do not think the earlier language was all that clear. But in any event, the Sentencing Commission explained that the purpose of its 1989

---

[4] The pre-1989 guideline read: "The term 'controlled substance offense' as used in this provision means an offense identified in 21 U.S.C. §§ 841, 845(b), 856, 952(a), 955, 955(a), 959; and similar offenses." USSG § 4B1.2(2), at 4.11 (1988). An application note added: "'Controlled substance offense' includes any federal or state offense that is substantially similar to any of those listed in subsection (2) of the guideline. These offenses include manufacturing, importing, distributing, dispensing, or possessing with intent to manufacture, import, distribute or dispense, a controlled substance (or a counterfeit substance)." *Id.* cmt. n.2, at 4.12.

amendment was "to clarify the definitions of crime of violence and controlled substance offense used in this guideline." U.S. Sentencing Guidelines Manual app. C, vol. I, Amend. 268 at 132–33 (2003). In that light, it would make little sense to say that the present guideline is clarified by looking at the earlier version. If, as suggested by Defendant, the earlier version clearly supported his position, the change in language would imply that the Commission was not comfortable with that position.

We should also respond to a comment repeated several times in the dissent, although it has no basis in any principle of statutory interpretation. The dissent suggests that we should not adopt a definition contrary to a definition that "was promulgated by elected legislatures." Dissent at 5. The implication is that when Congress has defined a term (as it has with *counterfeit substance*), we are violating the will of the people by adopting another definition. There might be some force to the argument if Congress had stated in a statute that its statutory definition of counterfeit substance was to apply throughout federal law, or at least to the sentencing guidelines. But the definitions in 21 U.S.C. § 802 are simply for words "[a]s used in this subchapter," meaning 21 U.S.C. §§ 801–904. That is the full extent of Congress' statutory command. Congress has not made any attempt to tell the Sentencing Commission how it must use the term *counterfeit substance* in its guidelines. It is worth noting that even when Congress has explicitly stated that a definition is to apply to a certain portion of the United States Code, the Supreme Court has repeatedly ignored that command when the context otherwise requires. *See, e.g., Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 316 (2014); *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009); *Philco Aviation, Inc. v. Shacket*,

462 U.S. 406, 409 (1983); *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949).

And as recently stated by Justice Ginsburg in *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (opinion of Ginsburg, J.), "We have several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute." The Supreme Court has even had occasion to reject the suggestion that a term in the Controlled Substances Act must be given the same definition as it has under the guidelines. *See DePierre v. United States*, 564 U.S. 70, 88 (2011) ("[W]e reject DePierre's suggestion that the term 'cocaine base' as used in [21 U.S.C. § 841(b)(1)(A)(iii), (B)(iii)] must be given the same definition as it has under the Guidelines."). In that case the defendant wished to benefit from the guidelines definition, which was narrower than the definition of the statutory term adopted by the Court. The Court denied the defendant his wish, and it never suggested that the Sentencing Commission had to use the word the same way that the statute did.

Thus, standard tools of statutory interpretation all point to the government's construction of the guidelines definition of *controlled substance offense*. This should suffice to affirm the sentence imposed by the district court.

But there is more. Institutional considerations also argue in favor of that result. At least five other circuits have reached the same conclusion as we do here. *See United States v. Hudson*, 618 F.3d 700, 704 (7th Cir. 2010); *United States v. Mills*, 485 F.3d 219, 225 (4th Cir. 2007); *United States v. Robertson*, 474 F.3d 538, 541 (8th Cir. 2007); *United States v. Crittenden*, 372 F.3d 706, 709 (5th Cir. 2004); *United States v. James*,

16

712 F. App'x 838, 840 (11th Cir. 2017) (citing *United States v. Frazier*, 89 F.3d 1501, 1505 (11th Cir. 1996)); *United States v. Smith*, 156 F. App'x 154, 155–56 (11th Cir. 2005) (same). None have agreed with Defendant's position.

We should not create a circuit split merely because we think the contrary arguments are marginally better. A number of circuits have stated that only a "compelling" or "strong" reason can justify creation of a circuit split. *See Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 411 (2018) ("As a general rule, we decline to create a circuit split unless there is a compelling reason to do so." (internal quotation marks omitted)); *United States v. Nesmith*, 866 F.3d 677, 680 (5th Cir. 2017) (adopting the same position as other circuits "[b]ecause [the appellant] has not provided a compelling reason to create a circuit split."); *Janese v. Fay*, 692 F.3d 221, 227 (2d Cir. 2012) ("[I]n the absence of compelling reasons to the contrary, maintaining a circuit split . . . is inadvisable."); *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 31 (1st Cir. 2004) ("A court of appeals should always be reluctant to create a circuit split without a compelling reason, and none exists here."); *Wagner v. PennWest Farm Credit, ACA*, 109 F.3d 909, 912 (3d Cir. 1997) ("In light of such an array of precedent [from other circuits], we would require a compelling basis to hold otherwise before effecting a circuit split."); *Wash. Energy Co. v. United States*, 94 F.3d 1557, 1561 (Fed. Cir. 1996) ("As a general matter, we do not create conflicts among the circuits without strong cause. We adhere to this view because federal law (unlike state law) is supposed to be unitary." (citation and internal quotation marks omitted)); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("We do not create conflicts

17

among the circuits without strong cause."), *abrogated on other grounds by Field v. Mans*, 516 U.S. 59, 74–75 (1995).  This court has simply expressed reluctance to create a circuit split, without describing the threshold necessary to overcome the reluctance.  *See United States v. Smith*, 815 F.3d 671, 677 (10th Cir. 2016) ("[O]ur reading . . . avoids the unnecessary creation of a circuit split."); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 528 (10th Cir. 1987) ("[W]e are not inclined to create a split in the circuit courts."); *see also United States v. Games-Perez*, 695 F.3d 1104, 1115 (10th Cir. 2012) (Murphy, J., concurring in denial of rehearing en banc) ("[T]he circuits have historically been loath to create a split where none exists. . . . [As one circuit put it,] 'Absent a strong reason to do so, we will not create a direct conflict with other circuits.'" (citations omitted)); *id.* at 1123 n.7 (Gorsuch, J., dissenting from denial of rehearing en banc) ("[W]hile the concurrence quotes cases from other circuits counseling against creating a circuit split 'absent a strong reason to do so,' inconsistency with an unambiguous statutory direction from Congress surely qualifies as just such a strong reason." (citation omitted)).  But at least there must be a "sound reason" to go against the tide.  *Anderson v. Private Capital Grp.*, 549 F. App'x 715, 718 (10th Cir. 2013).  As one member of this court has explained, "The avoidance of unnecessary circuit splits furthers the legitimacy of the judiciary and reduces friction flowing from the application of different rules to similarly situated individuals based solely on their geographic location."  *Games-Perez*, 695 F.3d at 1115 (Murphy, J., concurring in denial of rehearing en banc).  And the greater the number of circuits that are aligned together, the more an appropriate judicial modesty should make us reluctant to reject that uniform judgment.  Although Defendant's

argument is hardly frivolous, we do not think it sufficiently persuasive to overcome that reluctance.

Supporting our view that there is not a good reason, much less a strong or compelling one, to split from the other circuits on this issue is the inaction of the Sentencing Commission. The Commission has declined to amend the guidelines definition of *controlled substance offense* to counter the unanimous circuit opinions (say, by adding a simple cross-reference to the federal statutory definition of *counterfeit substance*) during the 15 years since the first published circuit opinion adopting our position, even after two panel dissents, *see Crittenden*, 372 F.3d at 710 (Dennis, J., concurring in part and dissenting in part); *Frazier*, 89 F.3d at 1508, (Godbold, J., concurring in part and dissenting in part), and the Seventh Circuit's explicit suggestion more than nine years ago that the issue "may be worth the attention of the Sentencing Commission." *Hudson*, 618 F.3d at 704. This court has repeatedly said that the Commission's failure to modify a guideline in response to judicial interpretations of the guideline indicates Commission satisfaction with the interpretation. In *United States v. O'Flanagan*, 339 F.3d 1229, 1231 (10th Cir. 2003), the issue was the propriety of applying the cross reference to § 2X1.1 in § 2K2.1 to calculate an offense level under the robbery guideline in § 2B3.1. We supported our rejection of the defendant's argument by noting that it was contrary to prior decisions of this court and other circuits and that "the Sentencing Commission has not expressed displeasure with the uniform judicial interpretation and application of § 2X1.1 in the years following." *Id*. at 1235. Similarly, in *United States v. Laughrin*, 438 F.3d 1245, 1248–49 (10th Cir. 2006), we followed an

interpretation of a guideline subsection by two other circuits, saying: "[E]ven if we would have been inclined to disagree with the decisions by our fellow circuits as a matter of first impression, their persuasive force has been magnified by the Sentencing Commission's apparent agreement with these decisions," in that "the Sentencing Commission has amended [the applicable guideline] twelve times since [the first of the circuit decisions]" without changing the language of the pertinent guideline subsection. *See also United States v. Rosales-Garcia*, 667 F.3d 1348, 1355 (10th Cir. 2012).

We recognize that the Supreme Court has held that "Congress' failure to overturn a statutory precedent is [no] reason for this Court to adhere to it." *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989). The Court reasoned that "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation. Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. Congressional inaction cannot amend a duly enacted statute." *Id*. (citations and internal quotation marks omitted).

But the Sentencing Commission is not Congress. It is an agency within the judicial branch, *see* 28 U.S.C. § 991(a) ("There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission . . . ."), with a unique relationship to the courts. For example, although a core responsibility of the Supreme Court is to resolve circuit splits, the Court decided in *Braxton v. United States*, 500 U.S. 344, 348 (1991), that circuit splits regarding the sentencing guidelines are best left to the Sentencing Commission to resolve through

amendments to the guidelines. The Court began by reiterating its essential role in resolving disagreements within the lower courts even though other institutions (Congress and agencies) could act to eliminate doubt for the future.

> A principal purpose for which we use our certiorari jurisdiction, and the reason we granted certiorari in the present case, is to resolve conflicts among the United States courts of appeals and state courts concerning the meaning of provisions of federal law. With respect to federal law apart from the Constitution, we are not the sole body that could eliminate such conflicts, at least as far as their continuation into the future is concerned. Obviously, Congress itself can eliminate a conflict concerning a statutory provision by making a clarifying amendment to the statute, and agencies can do the same with respect to regulations. Ordinarily, however, we regard the task as initially and primarily ours.

*Id.* at 347–48. But, it continued, "this may not be Congress' intent with respect to the Sentencing Guidelines." *Id.* at 348. Noting that 28 U.S.C. § 994(o) imposes on the Commission the duty "periodically to review and revise" the Guidelines, the Court explained: "The Guidelines are of course implemented by the courts, so in charging the Commission periodically to review and revise the Guidelines, Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest." *Id*. at 348 (brackets and internal quotation marks omitted). The statutory grant of this Commission responsibility "alone might induce us to be more restrained and circumspect in using our certiorari power as the primary means of resolving such conflicts," *id*.; but there was more. "In addition to the *duty* to review and revise the Guidelines, Congress has granted the Commission the unusual explicit *power* to decide whether and to what extent its amendments reducing sentences will be given retroactive

21

effect, 28 U.S.C. § 994(u)." *Id*. The Court therefore decided to forgo review of the circuit conflict, leaving that to an ongoing Commission proceeding on the issue. Since then, the Court has continued to leave it to the Commission to resolve circuit conflicts regarding interpretation of the guidelines.

The Commission has repeatedly expressed its proactive stance in clarifying and improving the guidelines. *See, e.g.*, United States Sentencing Commission, 2013 Annual Report, A-19 ("The Commission closely monitors the sentencing decisions of the federal courts to identify areas in which guideline amendments, research, or legislative action may be needed.") Then-Circuit Judge Alito commented on the uniqueness of the Commission's role in an essay reviewing its 1991 Annual Report:

> As a court of appeals judge, I was interested by the Report's laconic statement that many of the amendments the Commission promulgated in 1991 were "intended to clarify existing guidelines, policy statements, and commentary." What this statement means in part is that the Commission, through the amendment process, is now performing with respect to the interpretation of the guidelines essentially the same role that the Supreme Court plays with respect to the interpretation of other federal laws: resolving circuit conflicts and generally keeping the courts of appeals in line. . . . *As far as I am aware, no other federal agency—in any branch— has ever performed a role anything like it.*

Samuel Alito, *Reviewing the Sentencing Commission's 1991 Annual Report*, 5 Fed. Sent'g Rep. 166, 168 (1992) (footnote omitted, emphasis added).

The dissent suggests that the Sentencing Commission limits its clarification amendments to resolving circuit splits. But that misstates Commission practice. To be sure, the Commission does take circuit splits seriously. Among the 53 amendments promulgated since 2011, there are 12 that say that some of the changes in the amendment

22

are responses to circuit splits. *See* U.S. Sentencing Guidelines Manual supp. to app. C, Amend. 801 at 133–37 (2018); *id.*, Amend. 795 at 111–12; *id.*, Amend. 794 at 108– 09; *id.*, Amend 792 at 104; *id.*, Amend. 786 at 76–77; *id.*, Amend. 784 at 72–73; *id.*, Amend. 780 at 51– 52; *id.*, Amend. 775 at 40–41; *id.*, Amend. 774 at 38–39; *id.*, Amend. 767 at 18–19; *id.*, Amend. 766 at 15–16; *id.*, Amend. 764 at 10–11. But the Commission, in keeping track of what is going on in the courts, does not need to wait for a circuit split. In the 53 post-2011 amendments, there are five stating that they are clarifying guidelines in response to circuit-court decisions where no split was noted, *see id.*, Amend. 812 at 194–95 (2018); *id.*, Amend. 809 at 189; *id.*, Amend. 803 at 160–62; Amend. 785 at 73– 74; *id.,* Amend 762 at 8; three respond to district-court decisions, *see id.*, Amend. 810 at 189; *id.,* Amend. 807 at 176 (2018); *id.*, Amend. 802 at 145; and three respond to concerns raised by persons outside the judiciary, *see id.*, Amend. 803 at 159–60 (note that another provision of Amendment 803 also separately responds to judicial decisions, as cited above); *id.,* Amend. 799 at 128; *id.*, Amend. 783 at 70–71. Most pertinent, on at least one occasion it did what it has failed to do with respect to the question before us—it amended a guideline "to address criticism by the Seventh Circuit regarding potential ambiguity in how the [guideline] is currently phrased." *Id.*, Amend. 803 at 162; *see Hudson*, 618 F.3d at 704. The Commission's role is significantly broader than that of the Supreme Court in resolving circuit splits.

The unique nature of the Sentencing Commission as it relates to the federal courts requires a careful examination of whether its inaction in the face of numerous judicial interpretations over an extended period of time may be of more consequence than a

23

failure of Congress to amend a statute. We think it is. The Commission has adopted 813 amendments to the guidelines, some of which make numerous changes. Given the Commission's duty and practice of reviewing how the federal courts are applying the guidelines, it is clear that the failure to act has not been because of ignorance of circuit decisions; and the Commission's small size and focus on detail would ordinarily make inertia or the complexity of the enactment process an unlikely cause of inaction. If, for instance, the Commission wished to make clear that the term *counterfeit substance* in a guideline is defined in the federal statute, that wish could be easily fulfilled. Also, because of the explicit statutory grant to the Commission of the power to make guidelines amendments retroactive, it is the present views of the Commission that are of paramount importance. Even if it believes that the courts have correctly captured the original meaning of a guidelines provision, it can revise its earlier view and make the "correction" retroactive. Or if it believes that the courts have misinterpreted its original guideline but it is content with the "new" version, it can leave the misinterpretation undisturbed.

In this light, we can say with some confidence that the Commission—being fully aware of the circuit-court interpretations of *counterfeit substance* in the guideline, the dissents from those decisions, and the suggestion by the Seventh Circuit that the Commission address the issue—has not thought that the court decisions present a significant problem for the guidelines. That being the case, we see no good reason to create a circuit split.

## II.    CONCLUSION

We **AFFIRM** Defendant's sentence.

24

17-1405, *United States v. Thomas*
**MATHESON**, Circuit Judge, dissenting:

Mr. Thomas pled guilty to being a felon in possession of a firearm. He previously had been convicted for distribution of an "imitation controlled substance"—fake heroin—in violation of Colorado law.[1] Because the district court concluded this prior offense was for selling a "counterfeit substance," it held that the state conviction qualified as a "controlled substance offense" under United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") §§ 2K2.1 and 4B1.2(b), and it relied on the state conviction to impose an enhanced sentence for the felon-in-possession conviction.

Mr. Thomas challenges his sentence. Resolution of his appeal turns on choosing between two competing definitions of the term "counterfeit substance." The majority affirms Mr. Thomas's enhanced sentence based on the dictionary definition and common meaning of the word "counterfeit." Maj. Op. at 17. In the drug enforcement context, however, the U.S. Congress and most state legislatures define "counterfeit substance" more narrowly than the district court's and majority's dictionary-based definition. Because the Sentencing Commission promulgated Guidelines addressing drug offenses

---

[1] Under Colorado law, an "imitation controlled substance" is "a substance that is not the controlled substance that it is purported to be but which, by appearance, including color, shape, size, and markings, by representations made, and by consideration of all relevant factors as set forth in section 18-18-421, would lead a reasonable person to believe that the substance is the controlled substance that it is purported to be." Colo. Rev. Stat. Ann. § 18-18-420(3). A separate provision makes it "unlawful for a person to manufacture, distribute, or possess with intent to distribute an imitation controlled substance." *Id.* § 18-18-422(1)(a).

against that legislative backdrop, we should rely on the predominant legal definition of the term. I therefore dissent.

## I. **BACKGROUND**

The Sentencing Guidelines increase the sentence for a firearms offense when a defendant has previously committed a "crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a). If the firearm offense occurred after one such crime, the Guidelines set a base offense level at 20. U.S.S.G. § 2K2.1(a)(4). If it occurred "subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense," § 2K2.1(a)(2) provides for a base offense level of 24.

To define its terms, § 2K2.1 incorporates § 4B1.2(b), which states that a "controlled substance offense" is "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (*or a counterfeit substance*) . . . ." U.S.S.G. § 4B1.2(b) (emphasis added); *see* U.S.S.G. § 2K2.1 cmt. n.1 (adopting the definition of "controlled substance" provided in § 4B1.2). Neither U.S.S.G. § 2K2.1 nor § 4B1.2(b) defines "counterfeit substance."

Mr. Thomas pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Before that conviction, Mr. Thomas had pled guilty to two felonies: (1) robbery and (2) felony distribution of an imitation controlled substance under Colorado Revised Statute § 18-18-422(1)(a).

At sentencing, the district court found that Mr. Thomas's robbery conviction qualified as a "crime of violence" and his imitation controlled substance offense qualified

2

as a "controlled substance offense." ROA, Vol. III at 53. It regarded the imitation controlled substance to be a "counterfeit substance" based on the "plain and ordinary meaning" of "counterfeit." *Id.* The court thus set Mr. Thomas's base offense level at 24, which yielded a Guideline range of 57 to 71 months of imprisonment. It sentenced Mr. Thomas to 64 months in prison and three years of supervised release.[2] Mr. Thomas reserved his right to appeal the district court's ruling that his "imitation controlled substance" offense qualified as a "controlled substance offense" under U.S.S.G. § 2K2.1(a)(2). He filed a timely notice of appeal.

On appeal, the parties dispute the meaning of "counterfeit substance" in § 4B1.2(b). Relying on dictionaries and "common meaning," Maj. Op. at 4, the majority accepts the district court's view that "counterfeit substance" is a substance that is "made in imitation of something else with intent to deceive," ROA, Vol. III at 52-53; *see* Maj. Op. at 4.[3] As the majority and the parties acknowledge, however, legislatures have adopted a different definition. The Controlled Substances Act ("CSA"), 18 U.S.C. § 802(7); 36 states and the District of Columbia; and the Uniform Controlled Substances Act use the term "counterfeit substance" to mean a mislabeled or misbranded controlled substance.[4] This legislative definition is narrower than the dictionary-based definition

---

[2] If the base offense level had been 20 instead of 24, Mr. Thomas's Guideline range would have been 37 to 46 months.

[3] As discussed below, the majority does not define "substance."

[4] The CSA defines "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter."

3

endorsed by the majority and district court.  Under the legislative definition, Mr. Thomas's prior Colorado offense would not qualify as a controlled substance offense under § 4B1.2(b), resulting in a lower advisory Guidelines range.

* * * *

Before proceeding to the analytical discussion, a brief summary may be useful regarding three key terms:  "controlled substance," "counterfeit substance," and "imitation controlled substance."  Only the first two terms appear in § 4B1.2(b): "controlled substance (or a counterfeit substance)."  Under the district court's and the majority's reading of § 4B1.2(b), "counterfeit substance" includes "imitation controlled substance."  If "counterfeit substance" in § 4B1.2(b) is the legislative definition—a mislabeled controlled substance—the Guideline does not apply to an "imitation controlled substance" offense.

---

21 U.S.C. § 802(6).  It excludes alcohol and tobacco.  *Id.*  It defines "counterfeit substance" as

> a controlled substance which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, number, or device, or any likeness thereof, of a manufacturer, distributor, or dispenser other than the person or persons who in fact manufactured, distributed, or dispensed such substance and which thereby falsely purports or is represented to be the product of, or to have been distributed by, such other manufacturer, distributor, or dispenser.

21 U.S.C. § 802(7).

4

## II. DISCUSSION

"We interpret the Sentencing Guidelines according to accepted rules of statutory construction." *United States v. Marrufo*, 661 F.3d 1204, 1207 (10th Cir. 2011) (quotations omitted). Although the majority relies on various approaches to support its definition of "counterfeit substance," this case turns on whether the phrase's meaning should be based on the dictionary and common meaning or on the definition legislated by the U.S. Congress and a substantial majority of state legislatures.

The following discussion (A) explains why we should adhere to the legislative rather than the dictionary-based definition of "counterfeit substance," and (B) responds to the majority's points.

### A. *Legislative Versus Dictionary Definition of "Counterfeit Substance"*

We should choose the legislative definition because it (1) provides a complete definition of "counterfeit substance"; (2) avoids the limitations inherent in dictionary definitions; (3) was promulgated by elected legislatures; and (4) stems from the drug enforcement context in which the Guideline term is used. *See FAA v. Cooper*, 566 U.S. 284, 291-99 (2012) (using legal context to define "actual damages").

First, only legislatures have fully defined the phrase "counterfeit substance" that appears in § 4B1.2(b). Dictionaries define "counterfeit," but not "counterfeit substance." The dictionary definition therefore omits half of the relevant language. *See Sullivan v. Stroop*, 496 U.S. 478, 483 (1990) ("But where a phrase in a statute appears to have become a term of art, . . . any attempt to break down the term into its constituent words is not apt to illuminate its meaning."). When presented with competing definitions, we

5

should generally adopt the definition that defines the whole term rather than a portion of it.

Second, although courts commonly consult dictionaries to understand statutory terms,[5] dictionaries should not always be the first tool of interpretation, especially when a term has a widely recognized and established legislative definition. *See* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) ("Sometimes context indicates that a technical meaning applies. . . . And when the law is the subject, ordinary legal meaning is to be expected, which often differs from common meaning."); *see also* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) ("And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

The Supreme Court recently explained that when courts interpret a term with an established "legal lineage," dictionaries have limited utility. *See Hall v. Hall*, 138 S. Ct. 1118, 1124-25 (2018) (declaring "[t]his is not a plain meaning case" and declining to rely on the dictionary definition of "consolidate" because the term had an established legal

---

[5] *See* James J. Brudney & Lawrence Baum, *Protean Statutory Interpretation in the Courts of Appeals*, 58 Wm. & Mary L. Rev. 681 (2017) (empirical study of dictionary usage in the Supreme Court and Courts of Appeals). The reliance on dictionaries has extended to the Sentencing Guidelines. *See*, *e.g.*, *United States v. Wolf*, 860 F.3d 175, 198 (4th Cir. 2017) (using dictionary definition to interpret Guideline term); *United States v. Dougherty*, 754 F.3d 1353, 1359 (11th Cir. 2014) (same).

meaning).  *Hall*'s holding is in line with many others.[6]  This guidance favors the legislative definition over the dictionary in this case.[7]

Third, legislators are elected, accountable lawmakers whose enactments defining a particular term should receive judicial deference relative to writers and editors of dictionaries.  As Judge Mikva said, "Congress is like Humpty Dumpty in *Through the Looking Glass*.  When Congress uses a word, the word means what Congress says it means, all the dictionary definitions to the contrary notwithstanding.  If Congress has established what it wants a word to mean, that is what it means."  Abner J. Mikva, *A Reply to Judge Starr's Observations*, 1987 Duke L.J. 380, 386 (1987).  In this instance, 38 legislatures have adopted a definition that is contrary to the district court's dictionary-based definition.  To reject this definition would "give a judge the relatively unrestrained

---

[6] For example, the Supreme Court has instructed that "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (quotations and citations omitted).  It also has said that "[i]n the absence of contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).  *See also Binkley v. People*, 716 P.2d 1111, 1113 (Colo. 1986) ("It is a cardinal rule of statutory construction . . . that a term which has acquired a technical or particular meaning, whether by legislative definition or otherwise, should be construed according to its acquired meaning.").

[7] "Dictionaries are most useful to determine what *possible* meanings a word might have, but they are not as useful for reaching closure on what words might mean in different contexts, nor are they always useful for determining the ordinary meaning of word clusters (like 'driving a vehicle') . . . ."  William N. Eskridge, Jr., Interpreting Law: A Primer on How to Read Statutes and the Constitution 44 (2016).

power to look just at the statute's words and at Webster's Dictionary, and to decide with Webster's what the law of the land will be." *Id.*

The CSA does not state that its definition of "counterfeit substance" in § 802(7) shall apply to the Sentencing Guidelines. In that regard, the CSA's definition cannot bind our understanding of § 4B1.2(b) under a "[l]egislative supremacy doctrine . . . of statutory interpretation." Daniel A. Farber, *Statutory Interpretation and Legislative Supremacy*, 78 Geo. L.J. 281, 283 (1989). But the legislative definition is only a short step removed from the Guidelines because § 4B1.2(b) applies the term "counterfeit substance" to determine the sentencing consequences for violations of the criminal provisions in the CSA and state drug laws. Legislatures have defined this key term for this specific context. The dictionary writers have not, nor were they elected to do so.

Fourth, context matters.[8] "[W]ords may have different meanings when used in the context of a special subject, than they have in general usage." *United States v. Crittenden*, 372 F.3d 706, 711 (5th Cir. 2004) (quotations omitted). As the Supreme Court has recognized, the context in which a word is used can alter a word's meaning. *See United States v. Castleman*, 572 U.S. 157, 163-68 (2014) (defining "force" differently in the context of "violent felony" than in the context of "misdemeanor crime of domestic violence"); *see also* Stephen C. Mouritsen, *The Dictionary Is Not a Fortress: Definitional Fallacies and a Corpus-Based Approach to Plain Meaning*, 2010 B.Y.U. L.

---

[8] Judge Posner observed, "Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings." *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012).

Rev. 1915 (2010) (criticizing courts' reflexive reliance on dictionaries and arguing for a context-based approach to plain-meaning analyses).[9]

In this case, the context of a Guideline using prior drug offenses to calculate a sentence is criminal drug enforcement.[10]  In defining the term "controlled substance offense," § 4B1.2(b) uses the term "counterfeit substance," putting it squarely in the category of offenses—state and federal—concerning criminal drug activity.[11]  State and federal legislatures define the crimes underlying a defendant's prior convictions.  And, as previously noted, the majority of states and the United States define "counterfeit substance" as Mr. Thomas proposes for § 4B1.2(b).

Because Sentencing Guidelines regarding prior drug offenses fall squarely in the context of criminal drug laws, we should rely on legislators over lexicographers and

---

[9] *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 438-42 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment) (discussing merits of using context-based tools to determine plain meaning).

[10] The primary audience for the Guidelines reinforces the point that § 4B1.2(b) was written for the criminal drug enforcement context.  Given their complexity, "[i]ntricate guidelines are addressed not to potential criminals, but to the judges, prosecutors, and other officials who administer the criminal justice system."  Ronald F. Wright, *Complexity and Distrust in Sentencing Guidelines*, 25 U.C. Davis L. Rev. 617, 618 (1992).  As Professor Eskridge explains, the case for the "technical [meaning of] terms is strongest and most relevant" for rules "addressed to particular public or private officials and not to the general population."  Eskridge, *supra* note 7, at 60.

[11] Justice Scalia, a leading proponent of dictionary usage, wrote that "[t]he meaning of terms on the statute books ought to be determined . . . on the basis of which meaning is (1) most in accord with context and ordinary usage, and . . . (2) most compatible with the surrounding body of law into which the provision must be integrated."  *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528 (Scalia, J., concurring).

9

interpret the term "counterfeit substance" in accordance with its established legal

meaning. *See Hall*, 138 S. Ct. at 1124-25 (interpreting the term "consolidate" according

to its legal, rather than common usage, definition).

B. ***Responses to the Majority's Other Points***

"As a general rule," the majority agrees that "when dealing with a technical or

specialized subject, we should understand terms in their technical or specialized

meaning." Maj. Op. at 7. The following addresses the majority's arguments to avoid that

"general rule" and use the dictionary definition instead.

First, the majority relies on *Johnson v. United States*, 599 U.S. 133, 138-40

(2010), in which the Supreme Court interpreted the meaning of the word "force" in the

Armed Career Criminal Act and favored the dictionary over the common law definition.

Maj. Op. at 7-8. The Court, however, started with the common law definition,

recognized it as a term of art, and decided it did not "fit" with other terms in the statute,

all before turning to the dictionary. In other words, the Court's first option was the

common law's definition, not the dictionary's.[12] *See also Chapman v. United States*, 500

U.S. 453, 454 (1991) (stating that because "the Sentencing Guidelines do not define

---

[12] The Supreme Court's later decision in *Castleman*, 572 U.S. at 168, applied *Johnson* and found that a "misdemeanor crime of domestic violence" is satisfied "by the degree of force that supports a common-law battery conviction." *Castleman* therefore clarified that, where the common law definition of a term of art fits with other terms of the statute, courts need not resort to the dictionary definition. *See id.* It reached that conclusion, in part, by looking to state assault and battery laws. *Id.* at 167.

10

'mixture,' and it has no established common-law meaning, it must be given its ordinary meaning").[13]

Our circuit follows a similar approach to understand references to generic offenses in the Guidelines. *See*, *e.g.*, *United States v. Rivera-Oros*, 590 F.3d 1123, 1126-27 (10th Cir. 2009) (looking at "a wide range of sources . . . including federal and state statutes, the Model Penal Code, dictionaries, and treatises" to define the generic, contemporary meaning of an offense under the Guidelines).

Second, the majority urges that applying the legislative definition of "counterfeit substance" to § 4B1.2(b) would make "(or a counterfeit substance)" redundant. Maj. Op. at 8-9. This would, the majority states, "add[] no substantive content" to § 4B1.2(b)'s definition of "controlled substance offense" because "every counterfeit substance is already a controlled substance." *Id.* at 8.

The majority relies heavily on this canon. But the redundancy (or surplusage) canon is not always conclusive and may be discounted in statutory interpretation. *See Lamie v. United States Tr.*, 540 U.S. 526, 536 (2004) ("[O]ur preference for avoiding surplusage constructions is not absolute."); *Chickasaw Nation v. United States*, 534 U.S.

---

[13] In another case called *Johnson v. United States*, 529 U.S. 694, 706-08 (2000), the Supreme Court bypassed a dictionary definition when it was clear Congress had intended a different meaning. The Court held that a provision in the 1984 Sentencing Reform Act that authorized a district court to "revoke" a term of supervised release and send the defendant back to prison also allowed the imposition of a further term of supervised release after the incarceration. *Id.* at 703-07. The Court acknowledged that the primary dictionary definition of "revoke" is "to annul by recalling or taking back." *Id.* at 704 (quoting Webster's Third New International Dictionary 1944 (1981)). But it concluded that Congress wanted to use "revoke" in an unconventional sense, "allowing a 'revoked' term of supervised release to retain vitality after revocation." *Id.* at 707.

11

84, 94 (2001); Scalia & Garner, *supra*, at 176-79.[14]  As the Supreme Court recently explained,

> If one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute.  But only a clue.  Sometimes the better overall reading of the statute contains some redundancy.

*Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).  In the Guidelines context, the Fifth Circuit has held that the "canon is inapt in the context of [U.S.S.G. §] 4A1.1, in which the [Sentencing] Commission was trying to account for myriad 'jurisdictional variations in offense definitions, sentencing structures, and manner of sentence pronouncement.'"  *United States v. Enrique-Ascencio*, 857 F.3d 668, 675 (5th Cir. 2017) (quoting U.S.S.G. § 4A1.1 cmt. background).  Stated succinctly, "[r]edundancy is not a silver bullet."  *Rimini St.*, 139 S. Ct. at 881.

Moreover, parentheticals are often used to clarify terms.  Here, the § 4B1.2(b) parenthetical may reasonably be read to clarify that "controlled substance offense" includes the legislative definition of "counterfeit substance."[15]  *See Mizrahi v. Gonzales*,

---

[14] "Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach."  Scalia & Garner, *supra*, at 176-77.  *See also* Linda D. Jellum, Mastering Statutory Interpretation 104 (2008) ("Statutes are not always carefully drafted.  Legal drafters often include redundant language on purpose to cover any unforeseen gaps or simply for no good reason at all.").

[15] Under the Controlled Substances Act, a "counterfeit substance" offense is not the same as a "controlled substance" offense.  As defined by statute, a "controlled substance" is (1) "a drug or other substance," (2) as defined in separate "schedules," and (3) is not alcohol or tobacco.  21 U.S.C. § 802(6).  A "counterfeit substance" is (1) a

12

492 F.3d 156, 166 (2d Cir. 2007) (noting that the disjunctive parenthetical in 8 U.S.C. § 1182(a)(2)(A)(i)(II) "need not be assigned a different meaning from the preceding language to avoid being surplusage; it can reasonably be construed to illustrate or explain the broader proposition").

A reader of § 4B1.2(b) would benefit from this clarification given that "controlled substance" and "counterfeit substance" appear side-by-side in the U.S. Code. The definition of "counterfeit substance" in 21 U.S.C. § 802(7) is separate from and comes immediately after the definition of "controlled substance" in § 802(6). Similarly, 21 U.S.C. § 841(a)(1) makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," while the next subsection, 21 U.S.C. § 841(a)(2), makes it unlawful "to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance."[16] The

_____

controlled substance, (2) mislabeled to look like it was produced by another person, and (3) which thereby purports to be from that person. *Id.* § 802(7). Thus, "counterfeit substance" incorporates the definition of "controlled substance," but it includes additional requirements.

Similarly, most states have "controlled substance" offenses that are distinct from "counterfeit substance" offenses. They also have distinct "imitation controlled substance" offenses. Colorado provides an example. *See* Colo. Rev. Stat. Ann. § 18-18-405 (controlled substances); *id.* § 18-18-422 (imitation controlled substances); *id.* § 18-18-423 (counterfeit controlled substances).

[16] The majority notes that § 841(a)(1) uses the word "manufacture," while § 841(a)(2) instead uses "create." It then points out that § 4B1.2(b) uses "manufacture" and suggests that the Guideline's word choice is significant. *See* Maj. Op. at 13. The difference between (a)(1) and (a)(2) may suggest there is a difference between manufacturing a controlled substance and creating a counterfeit substance, but it does not change that, under § 802(7), a "counterfeit substance" is necessarily a "controlled substance." In other words, if the definition of "counterfeit substance" is redundant in

13

terms "controlled" and "counterfeit" substance are related and often appear together. But they are not the same. The parenthetical in § 4B1.2(b) thus serves a useful, non-redundant clarifying function.

Third, the majority discounts § 4B1.2(b)'s placement of "or a counterfeit substance" in a parenthetical. Maj. Op. at 9-11. In general, parentheses "indicate a word, phrase, or clause that has been interjected by way of explanation or qualification" and are used to "set off an inserted phrase, clause, or sentence that [the author] *want*[*s*] *to minimize*." Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 365 (2016) (emphasis added). The majority, however, would have us "give substantive effect to language in [the] parenthetical" by interpreting "(or a counterfeit substance)" to "expand[] the relevant offenses to encompass those involving fake controlled substances." Maj. Op. at 10. This interpretation would significantly enlarge the substantive scope of the Guideline to cover multiple state offenses. Indeed, the district court's definition would expand the term "controlled substance offense" in § 4B1.2(b) to include offenses that *do not involve controlled substances*, such as Mr. Thomas's sale of rocks and sand made to look like heroin. The substantive reach of the district court's and majority's reading would seem to merit more than a mere parenthetical.

This is especially so because state law "imitation controlled substance" offenses—such as Mr. Thomas's—are not punishable under the federal narcotics laws. *See United*

---

§ 4B1.2(b), then, under the majority's logic, it must also be redundant under 21 U.S.C. § 802(6) and § 802(7).

*States v. Sampson*, 140 F.3d 585, 589 (4th Cir. 1998) ("Simply because a substance looks like cocaine, and the defendant misrepresents to his unsuspecting purchaser that the substance is cocaine, does not make the mere distribution of that substance a violation of the federal narcotics laws."). Moreover, states like Colorado label "imitation controlled substance" offenses as such. *See, e.g.*, Colo. Rev. Stat. Ann. § 18-18-420(3). If the Commission wished to include those offenses in its definition of "controlled substance offenses," it could easily have added the word "imitation."

Fourth, the majority emphasizes the Commission's use of the word "or" in "(or counterfeit substance)," noting that the Commission generally uses "or" in parentheticals to "expand[] the scope of [a] guideline to include things that would generally not be considered subsets of the term." Maj. Op. at 12. The majority's ensuing point is well-taken that the case for the legislative definition of "counterfeit substance" would be stronger if § 4B1.2(b) had said "(including a counterfeit substance)" instead of "(or a counterfeit substance)." But the majority's expansive interpretation of "counterfeit substance" would take the point too far, broadening the Guideline's coverage more than the Commission's other "or" parentheticals. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n.10(D) (using an "or" parenthetical to expand "name" to include "or other identifying information"). Maj. Op. at 12.[17] The "or" parenthetical here is more consistent with its

_____

[17] The majority's point that § 4B1.2(b) contains ten commas should draw the attention of drafting stylists, but whether commas, parentheticals, or nothing surrounds the words "counterfeit substance" does not make the case for the dictionary-based definition of "counterfeit substance" any stronger. Indeed, as noted above, using parentheticals around a phrase that, under the majority's understanding, would

15

clarifying message that the Guideline covers controlled substance offenses as defined in the federal and most criminal codes. *See Mizrahi*, 492 F.3d at 166 (concluding that the "or" parenthetical in 8 U.S.C. § 1182(a)(2)(A)(i)(II) "can reasonably be construed to *illustrate or explain* the broader proposition" (emphasis added)).

Fifth, the majority points to the lack of any cross-reference to the statutory definition of "counterfeit substance" in § 4B1.2(b) in contrast to Application Note 4 to U.S.S.G. § 2D1.1, which states that "counterfeit substances" are defined in 21 U.S.C. § 802(7) as "controlled substances that are falsely labeled." *See* Maj. Op. at 13-14. This point would carry more weight were it not for the Background Commentary to § 4B1.1 and its reference to 28 U.S.C. § 994(h). Section 994(h) provides for sentencing enhancements under the Guidelines for persons convicted of counterfeit substance offenses under 21 U.S.C. § 841, which in turn criminalizes counterfeit substance offenses based on § 802(7)'s definition. *See Crittenden*, 372 F.3d at 711 (Dennis, J., dissenting in part) (finding the CSA's "definition of the term 'counterfeit substance' has been effectively incorporated into the Guidelines"). This cross-reference to § 802(7) is, however, admittedly attenuated because it is not explicit and does not appear in § 4B1.2(b).

More telling is that courts routinely incorporate the CSA's definition of "controlled substance" into their Guidelines analysis even when the applicable Guidelines

---

incorporate multiple state imitation drug offenses into the Guideline does not seem to be the obvious punctuation choice.

section does not cross-reference the Act. *See United States v. Sanchez-Garcia*, 642 F.3d 658, 661-62 (8th Cir. 2011) (noting § 4B1.2(b) does not define "controlled substance" and using the CSA's definition to determine whether prior conviction qualified as a "controlled substance offense").[18]  In doing so, they draw on the legislative definition of "controlled substance" and the well-established body of law surrounding it. *See id.*  To illustrate, U.S.S.G. § 2L1.2 does not define "controlled substance," but it defines a "drug trafficking offense" using materially identical language to U.S.S.G. § 4B1.2(b)'s definition of "controlled substance offense."[19]  Yet even without a cross-reference, courts assume the CSA's legislative definition of a "controlled substance" applies. *See*, *e.g.*, *United States v. Leiva–Deras*, 359 F.3d 183, 189 (2d Cir. 2004) (using the CSA to determine whether a prior conviction meets the criteria for a "drug trafficking offense" under U.S.S.G. § 2L1.2(b)(1)(A)(i)).  Given that § 4B1.2(b) does not define "controlled

---

[18] *See also United States v. Kelly*, 991 F.2d 1308, 1316 (7th Cir. 1993) (using the CSA to determine if marijuana is a "controlled substance" under U.S.S.G. § 2K2.1(a)); *United States v. Madkins*, 866 F.3d 1136, 1144 (10th Cir. 2017) (relying on the CSA to define the word "distribute" under U.S.S.G. § 4B1.2(b)); *United States v. Gardner*, 534 F. Supp. 2d 655, 660-61 (W.D. Va. 2008) (holding that defendant's imitation controlled substance conviction was not a "felony drug offense" for the purposes of a statutory sentencing enhancement under 21 U.S.C. § 841(b)(1)(A)).

[19] Under § 2L1.2, a "drug trafficking offense" is "an offense under federal, state, or local law that prohibits the manufacture, import, export, distribution, or dispensing of, or offer to sell a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."  U.S.S.G. § 2L1.2, cmt. n.2; *see United States v. Walker*, 858 F.3d 196, 200 n.4 (4th Cir. 2017) ("The Guidelines' definition of 'controlled substance offense' is substantively identical to the definition of 'drug trafficking offense' at issue here.").

substance" or "counterfeit substance," and that courts rely on the CSA to understand the meaning of "controlled substance," courts should rely on the CSA's definition of "counterfeit substance" in § 802(7) for consistent Guidelines interpretation.

Sixth, the majority cites decisions from five other circuits that have reached the same conclusion it has reached. Maj. Op. at 17-19.[20] But two of the decisions drew dissents, *see Crittenden*, 372 F.3d at 710 (Dennis, J., dissenting in part); *United States v. Frazier*, 89 F.3d 1501, 1508 (11th Cir. 1996) (Godbold, J. dissenting in part), and the Seventh Circuit correctly recognized that the issue presents a "surprisingly complicated question," *United States v. Hudson*, 618 F.3d 700, 701 (7th Cir. 2010). We are, of course, not bound by out-of-circuit decisions.[21]

We have departed from our sibling circuits when we disagree with them. *See Jewell v. United States*, 749 F.3d 1295, 1300 (10th Cir. 2014) ("We are hesitant to create a circuit split, but we have little choice because we are obliged to follow the Supreme Court's holding . . . even if other circuit courts have not."); *see also United States v.*

---

[20] *See United States v. James*, 712 F. App'x 838, 840 (11th Cir. 2017) (unpublished) (citing *United States v. Frazier*, 89 F.3d 1501, 1505 (11th Cir. 1996)); *United States v. Hudson*, 618 F.3d 700, 705 (7th Cir. 2010); *United States v. Mills*, 485 F.3d 219, 225 (4th Cir. 2007); *United States v. Robertson*, 474 F.3d 538, 541 (8th Cir. 2007); *Crittenden*, 372 F.3d at 709.

[21] Neither are the district courts in this circuit. Since Mr. Thomas's sentence and conviction, at least two district court decisions in the Tenth Circuit addressed the issue. *See United States v. Horton*, 17-CR-00048-RM, Dist. Ct. Docs at 44, 48 (D. Colo. Sept. 15, 2017) (sentencing transcript not published); *United States v. Pigford*, No. 16-CR-00181-LTB, Dist. Ct. Doc. at 35 (D. Colo. Sept. 13, 2016) (same). In both, the district court agreed with the defendant, declining to accept the government's argument that the dictionary definition should be applied to "counterfeit" under U.S.S.G. § 4B1.2(b).

18

*Games-Perez*, 695 F.3d 1104, 1123 n.7 (10th Cir. 2012) (Gorsuch, J., dissenting from denial of reh'g en banc) ("Although we are hesitant to create a circuit split, we must follow the unambiguously expressed intent of Congress." (quotations and alterations omitted)). Recently, in *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016), we split with the D.C. Circuit notwithstanding the dissent's forceful criticism of our decision to do so. *See id.* at 1201 (McKay, J., dissenting) ("[T]he majority is resolved to create a circuit split. When there are competing understandings of Supreme Court precedent, I would prefer the outcome that does the least mischief."). The Supreme Court ultimately agreed with our view of the issue. *See Lucia v. SEC*, 138 S. Ct. 2044, 2050-51 (2018).[22]

In delegating to the Sentencing Commission the statutory duty "periodically [to] review and revise" the Guidelines, 28 U.S.C. § 994(o), "Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest," *Braxton v. United States*, 500 U.S. 344, 348 (1991). Advancing a contrary position on a Guideline interpretation alerts the Commission to take a second look.[23]

---

[22] Rigid adherence to prudential avoidance of a circuit split would give the first circuit to consider an issue the power to decide it for all circuits. As then-Professor Posner noted, "[A] difficult legal question is more likely to be answered correctly if it is allowed to engage the attention of different sets of judges deciding factually different cases than if it is answered finally by the first panel to consider it." Richard A. Posner, The Federal Courts: Crisis and Reform 163 (1985).

[23] *See* Samuel Estreicher & John Sexton, Redefining the Supreme Court's Role: A Theory of Managing the Federal Judicial Process 48 (1986) ("From the absence of a rule

I share the majority's reluctance about creating a circuit split. But I am wary about subordinating the decisions of elected legislators, who have defined the term at issue here, to those of lexicographers, who have defined only half of the term for all contexts, for the sake of acquiescing to out-of-circuit decisions.

Seventh, the majority relies on the Sentencing Commission's inaction in the face of the circuit opinions that have addressed this issue. Maj. Op. at 19-25. This court has been reluctant to rely on Commission inaction. *See United States v. Smith*, 133 F.3d 737, 748 (10th Cir. 1997) ("Since no guideline amendments were proposed, [the defendant] interprets the Commission's inaction as endorsing the adequacy of the existing guidelines. [The defendant] reads too much into the Commission's inaction."); *see also United States v. Marshall*, 998 F.2d 634, 636 n.4 (8th Cir. 1993) ("Several years of inaction arguably suggests Congressional and Sentencing Commission satisfaction with the current situation, but we do not discount the force of inertia in governmental affairs."); *Advanced Micro Devices v. C.A.B.*, 742 F.2d 1520, 1541 (D.C. Cir. 1984) ("The general rule is that congressional inaction or congressional action short of the enactment of positive law, like postenactment legislative history, is often entitled to no weight in construing a statute.") (citing and discussing scholarly commentary).

Why has the Commission not clarified § 4B1.2(b)? We could speculate that the Commission's inaction connotes approval of judicial interpretation of the Guidelines, or

---

of intercircuit stare decisis . . . we derive a basic premise that disuniformity, at least in the short run, may be tolerable and perhaps beneficial.").

20

that the Commission instead has focused more on addressing circuit splits.[24]  But

engaging in this conjecture would raise a host of questions, including:  (1) How long

must the Commission fail to act before we draw meaning from its silence?  (2) How

many circuits must weigh in on the issue before we decide that view is established?  (3)

Do district court opinions count?  (4) Does an inference from Commission inaction

require judicial consensus?  And (5) do dissenting opinions matter?  Although

Commission inaction may "offer[] . . . a modicum of . . . support" for an existing

interpretation in some circumstances, *see United States v. Rosales-Garcia*, 667 F.3d

1348, 1355 (10th Cir. 2012), interpreting the Commission's silence can be a speculative

exercise.  This factor does not, in my view, outweigh the predominant legislative

definition of "counterfeit substance."

### III.  CONCLUSION

The majority relies on the dictionary, a concern about redundancy, the lack of a

cross-reference in § 4B1.2(b) to § 802(7), fear of a circuit split, and Commission inaction.

The redundancy concern is unpersuasive.  On the cross-reference point, the context in

which § 4B1.2(b) falls and the foregoing discussion provide countervailing

considerations.  The prudential concern about a circuit split is legitimate but overstated.

---

[24] Indeed, many amendments to the Guidelines have addressed "circuit conflicts."
The majority identifies 12 such amendments since 2011.  Maj. Op. at 23.  I count at least
49 overall.  *See* U.S.S.G. app. C, amends. 472, 500, 549, 552, 564, 566, 568, 572, 579,
577, 580, 581, 582, 583, 591, 597, 602, 603, 604, 613, 614, 615, 617, 630, 632, 634, 635,
645, 660, 664, 667, 691, 693, 709, 731, 732, 741, 752, 759, 764, 766, 767, 774, 775, 780,
786, 794, 795, 801 (effective Nov. 1, 2018).

21

And Commission inaction is unconvincing. The case for the legislative definition is stronger than for the dictionary.

We should adhere to the established legal meaning of "counterfeit substance" as defined by 36 state legislatures, the District of Columbia, the Uniform Substances Act, and the U.S. Congress. Because Mr. Thomas's imitation controlled substance offense does not fit within that definition, I would remand for the district court to resentence him under a properly calculated Guideline range.